IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **JOHN W. NOBLE, JR., M.D., individually and on behalf of all others similarly situated,** | |
| **Plaintiff,** | **CASE NO. 2:24-cv-01361** |
| vs. | |
| **MULTIPLAN, INC., and MULTIPLAN CORP., VIANT, INC.** | |
| **Defendants.** | |

## CLASS ACTION COMPLAINT

Plaintiff John W. Noble, Jr., M.D. ("Plaintiff"), individually and on behalf of all others similarly situated, by and through undersigned counsel, for its Class Action Complaint ("Complaint") against Defendants MultiPlan, Inc., MultiPlan Corp., (collectively "Defendants"), states and alleges as follows:

## I.      INTRODUCTION

1.      Plaintiff brings this action on behalf of itself individually and on behalf of a plaintiff class (the "Class") pursuant to Federal Rule of Civil Procedure 23, consisting of all individuals or entities residing in Louisiana who have received reimbursement from one or more of Defendants or Co-Conspirators (defined herein), or a division, subsidiary, predecessor, agent, or affiliate of such entities, for out-of-network healthcare services from at least July 1, 2017 until present or when Defendants' unlawful misconduct and anticompetitive effects cease (the "Class Period").

2.      Plaintiff brings this action for treble damages under the antitrust laws of the United States against Defendants and demand a trial by jury.

**Page 1 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

3.     MultiPlan, Inc. ("MultiPlan") is a company that helps health insurers underpay struggling healthcare providers. It started as a company that sold nationwide "wrap" networks of contracted providers to insurance companies, so that insurers could supplement their own networks available to members of the insurers' Preferred Provider Organization (PPO) insurance plans. But over the past decade, MultiPlan has mutated into a company that offers what it calls "claims repricing" services to address the bills insurers receive when a member receives care not covered by the insurer's preferred network.

4.     "Claims repricing" is a misnomer: what MultiPlan's services do—what they are designed to do—is suppress and fix the prices insurers pay physicians for "out-of- network" medical care. Any time the word "repricing" is used to describe MultiPlan's services, it should be understood to mean "price-fixing."

5.     MultiPlan claims that its "repricing" "recommendations" are determined by an "algorithm" that calculates a reimbursement based on historical reimbursements to similar providers providing the same health care services, adjusted for cost-of-living. MultiPlan touts this methodology to healthcare providers and the public as a "fair" way to streamline out-of-network claims.

6.     But behind the scenes, the algorithm is little more than a tool to enable price fixing. After MultiPlan uses its "algorithm," called Data iSight, to calculate this "fair" reimbursement value, it "overrides" that value, replacing it with a pre-agreed-upon reimbursement rate selected by the insurers and MultiPlan. These pre-agreed upon reimbursement rates are far less than the insurance company would otherwise pay, far less than the healthcare provider's claim for reimbursement, and far less than the fair rate for the often life-saving services provided by the practitioners—especially when the ever-increasing costs of providing care are considered.

**Page 2 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

7.    All major insurers, and more than 700 smaller insurers, have joined with MultiPlan to form a cartel dedicated to depriving healthcare physicians of fair reimbursement for out-of-network services. Many well-known insurers—including UnitedHealth, Cigna, Humana, Aetna, Centene, and Elevance (the last of which includes many Blue Cross and Blue Shield associations) have taken an active role in perpetuating this scheme.

8.    Members of this MultiPlan Cartel agree on the method of pricing out-of-network claims. They agree to share their competitively sensitive reimbursement data to help drive the algorithm. They agree to allow MultiPlan to align the "override" values applied to the claims. They agree to pay healthcare providers what MultiPlan tells them to pay, and not to undercut other Cartel members with competitive pricing. They agree to condition payment on a providers' agreement not to bill the patient for the proportion of the claim the insurer does not pay—a critical step in keeping the existence of the Cartel secret.

9.    Their executives serve on a MultiPlan "advisory board," that meets frequently at luxury resorts where they discuss over lavish dinners ways to further suppress healthcare reimbursements. They join MultiPlan at road shows and marketing events where they meet with fellow co-conspirators to discuss how well the MultiPlan scheme is working for them, and how it can yet be improved. And they help MultiPlan market its out-of-network reimbursement scheme to recruit yet more insurers to the Cartel.

10.    In a competitive market, none of this would happen. In a competitive market, each health insurer would fiercely guard its reimbursement data as competitively sensitive information. Each would have an incentive to pay physicians fairly for out-of-network healthcare services rendered, so that those physicians will provide healthcare when the insurers' members need it. Large insurers would have an incentive to create their own claims-adjudication services in-house,

**Page 3 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

to compete with fellow insurers and save the expense of the large fees MultiPlan collected for its services. And all insurers *and* MultiPlan would compete by offering fair payment terms to healthcare providers that perform out-of-network services to ensure that their members would have a wide selection of healthcare providers to choose from who would accept them out-of-network, and to build goodwill with the providers with a goal of convincing healthcare providers to join or remain within their PPO network.

11.    This is because MultiPlan and the insurers are all horizontal competitors. They *should* compete with one another in the market for health care services provided to PPO members.

12.    PPO health plans are popular, sought-after health plans because they afford their members (patients) a broad choice in healthcare providers, regardless of whether the provider is rendering an "in-network" service (meaning that it has contracted with their insurer to accept significantly reduced reimbursement for that service) or "out-of-network" (meaning the services the provider renders are not governed by any contract, and the provider has not agreed to reduced payment).

13.    Companies that market PPO networks, like MultiPlan and insurers, compete with one another to build larger, broader, and more robust networks. A larger network commands higher premiums. So, in a competitive market, each insurer in the MultiPlan Cartel would have an incentive to create the largest network it could (with the hopes its network is larger than its competitors') by establishing a fair course of dealing with healthcare providers, which would inspire the healthcare providers to contract with that insurer. And MultiPlan would have an incentive to grow its network of providers, to ensure that it can sell access to the most valuable possible PPO network.

**Page 4 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

14.     Together, MultiPlan and its competitors accomplished a reimbursement suppression that none of them could accomplish on their own. If any insurer, on its own, tried to "reprice" healthcare providers' out-of-network claims to a fraction of what they were worth, the backlash from providers would be swift and harsh: they would stop treating that insurers' members, and refuse to contract with that insurer in the future. This could jeopardize the insurers' ability to offer a PPO at all, eliminating a substantial and lucrative source of income for that insurer. But by agreeing to pay near-uniform suppressed rates, the insurance-company members of the Cartel leave providers with no alternative—healthcare providers have no practical option but to accept the "repriced" reimbursement amount that MultiPlan sets. And the insurers preserve their ability to command steep premiums for access to flexible health insurance, all while paying ever lower reimbursements to the healthcare providers that treat the insurers' members.

15.     Both MultiPlan and its insurer co-conspirators profit handsomely from the Cartel. Each collect from insurance-plan sponsors (usually employers) a percentage of the "spread," or the difference between what a healthcare provider charges and what the insurer ultimately pays, as a fee for each claim suppressed. MultiPlan makes hundreds of millions of dollars a year in fees for its role at the heart of the Cartel, and large insurers make billions of dollars a year.

16.     Because the defendants are all horizontal competitors, their price-fixing conspiracy is *per se* unlawful under federal antitrust laws. But even if MultiPlan did not compete with insurers to build the best PPO network—even if MultiPlan was not in direct competition with insurers—the MultiPlan Cartel's conduct would nevertheless constitute an unlawful hub-and-spoke conspiracy, with MultiPlan at the hub, coordinating the activity of each of the insurers (the spokes) and making the conspiracy cohesive "like a mafia enforcer," to use the words of one market analyst describing MultiPlan. Each of the insurers that participate in the Cartel know that its competitors

**Page 5 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

are in on the scheme; that each competitor has agreed to allow MultiPlan a say in how much they reimburse healthcare providers; and even what their competitors reimbursement rates are. The antitrust laws would forbid direct competitors to share information and coordinate prices and terms in this way. But they also forbid direct competitors from agreeing to share that information through an intermediary, like MultiPlan.

17. Healthcare providers were the intended and actual victims of the MultiPlan Cartel's scheme. As MultiPlan repeatedly bragged in financial reports, its "repricing" methodology underpaid healthcare providers by more than $19 billion per year—and in the past two years, by more than *$22 billion* per year.

18. This squeeze is proving catastrophic for healthcare providers and, by extension, to the public. The healthcare industry has been and continues to be plagued by significant financial challenges. The costs to providers of providing care are surging and sustaining operations has become a struggle for hospitals and other patient care centers. Many hospital systems have gone bankrupt in recent years. Others, facing financial ruin, have been bought up by private equity companies; these consolidations leave patients with fewer healthcare options. Medicare reimbursement rates for years have failed to keep up with inflation, resulting in healthcare providers *losing* money almost every time they treat a patient with public health insurance. In this troubling environment, commercial insurance reimbursements comprise the majority of healthcare providers' revenue, and providers therefore depend upon competition among commercial payors to ensure that commercial insurance reimbursement rates are sufficient to cover costs and preserve patient access to health care across the United States.

19. The MultiPlan Cartel's illegal conspiracy to underpay healthcare providers threatens providers' very survival, and should be stopped.

**Page 6 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

## II.     JURISDICTION AND VENUE

20.     This action arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26. Plaintiff seeks damages for his injuries, and those suffered by members of the Class, resulting from Defendants' anticompetitive conduct. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1337(a) (antitrust), and 15 U.S.C. § 15 (antitrust).

21.     This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action in which the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, and at least one member of the putative class is a citizen of a state different from that of each Defendant.

22.     This Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367(a). This provision grants supplemental jurisdiction over all other claims, including those brought pursuant to the laws of the states, that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Plaintiff brings claims under the State of Louisiana's antitrust statute known as the Louisiana Monopolies Act, codified in Louisiana Revised Statutes (La. R.S.) § 51:121 *et seq*. This statute is designed to prevent monopolistic practices and to promote fair competition within the state. This Court may exercise jurisdiction over this claim.

23.     One or more Defendants resides or transacts business within this District, is licensed to do business or does business in this District, transacts its affairs and carries out interstate trade and commerce, in substantial part, in this District, and/or has an agent and/or can be found in this District. Venue is appropriate within this District under Section 12 of the Clayton Act, 15 U.S.C.

**Page 7 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

§ 22 (nationwide venue for antitrust matters), as well as 28 U.S.C. § 1391(b) and (c) (general venue provisions).

24.    The activities of Defendants and their co-conspirators, as described herein, were within the follow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on the interstate commerce of the United States. No other forum would be more convenient for the parties and witnesses to litigate this case.

### III.    THE PARTIES

**A.    Plaintiff**

25.    Plaintiff is an individual residing in Calcaciu Parish, Louisiana.  Plaintiff offered a range of orthopedic surgical services while employed at Center for Orthopaedics and Spine, LLC. Plaintiff provided out-of-network healthcare services at locations within the jurisdiction, and has had out-of-network claims repriced by one of more Defendants during the Class Period, including within the four years preceding the filing of this Complaint.

**B.    Defendants**

26.    Defendant MultiPlan, Inc., is a New York corporation with its principal place of business at 115 Fifth Avenue, 7th Floor, New York, NY 10003.

27.    Defendant MultiPlan Corporation is a provider of healthcare data and analytics products and services, incorporated in Delaware and headquartered in New York. MultiPlan Corporation is the corporate parent of MultiPlan, Inc. Unless otherwise noted, "MultiPlan," as used herein, refers to MultiPlan, Inc., MultiPlan Corporation, and those entities' subsidiaries, predecessors, and related entities.

28.    MultiPlan markets itself as using algorithms and data analytics to provide repricing and other services to health insurers and other customers. In 2023, MultiPlan introduced a new

**Page 8 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

"AI-enabled out-of-network" repricing methodology called "Pro Pricer." It claims that Pro Pricer will reprice OON claims for competing commercial insurers using over 40 years of "data and experience."

29.     MultiPlan became a publicly-traded company in October of 2020 when it effectuated a business combination with Churchill Capital Corporation III ("Churchill III"), a special purpose acquisition company (commonly referred to as a "SPAC"), which was created to raise funds to take a private company public by its parent corporation, Churchill Capital Corp. Churchill IIII and related entities acquired MultiPlan, Inc. and its related entities in October of 2020, and renamed the combined company MultiPlan Corporation.

30.     In 2010, MultiPlan acquired Defendant Viant, Inc., a healthcare payment solutions company incorporated in Delaware and headquartered in Illinois. Viant, Inc., and therefore MultiPlan, offers auditing and medical claims and costs reimbursement services, as well as pre-payment services such as facility bill review and professional negotiation to commercial and public health insurance customers in the United States. In 2010, MultiPlan also acquired Defendant Viant Payment Systems, Inc., a healthcare payment solutions company incorporated in Delaware and headquartered in Illinois.

31.     In 2011, MultiPlan acquired Defendant National Care Network, LP and its affiliate, Defendant National Care Network, LLC, healthcare cost management companies incorporated in Delaware and headquartered in Texas. As part of its 2011 acquisition of Defendant National Care Network, MultiPlan was able to add the Data iSight repricing tool to its offerings, which provides reimbursement repricing services to health insurers and other payers and customers, and it claims to utilize a patented methodology in evaluating healthcare reimbursement claims when doing so. Data iSight is a trademark of Defendant National Care Network, LLC.

**Page 9 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

32.     Collectively, MultiPlan Corp., MultiPlan, Inc., Churchill, Churchill III, Viant, Inc., Viant Payment Systems, Inc., National Care Network LP, National Care Network, LLC, and their affiliates comprise and are referred to as "MultiPlan."

## C.     Agents and Co-Conspirators

33.     Various other persons, firms and corporations not yet named as defendants have participated as co-conspirators in MultiPlan's scheme and have performed acts and made statements in furtherance of the conspiracy. These parties may be named as defendants in this case. The conspiracy includes any person or entity that has entered into an out-of-network repricing agreement with MultiPlan, used MultiPlan's out-of-network claim repricing tools to process claims for out-of-network healthcare services, or otherwise participated with Defendants in the alleged anticompetitive misconduct and have performed and made statements in furtherance of the conspiracy. Defendants are jointly and severally liable for the acts of their Co-Conspirators whether or not named as defendants in this Complaint.

34.     The acts alleged herein that were done by each of the Co-Conspirators were fully authorized by each of those Co-Conspirators, or ordered, or done by duly authorized officers, managers, agents, employees, or representatives of each Co-Conspirator while actively engaged in the management direction or control of its affairs. The acts charged in this Class Action Complaint as having been done by Defendants and their Co-Conspirators were authorized, ordered, and/or done by their officers, agents, employees, and/or representatives, while actively engaged in the management of their business and affairs.

**Page 10 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

## IV.    FACTUAL BACKGROUND

**A.    Overview of Out-of-Network Reimbursement and Repricing Markets**

1.    <u>Healthcare providers across the country depend on commercial insurers, like the Insurer Defendants and their co-conspirators, to provide fair, reasonable reimbursements for healthcare services rendered.</u>

*i.    Healthcare providers are struggling*

35.    American healthcare providers are struggling financially. While many healthcare providers were suffering before COVID-19, the pandemic triggered a nationwide financial crisis and led to healthcare providers suffering record losses in 2020. At the same time many patients were forgoing elective healthcare procedures and postponing routine treatment and preventative care, supply chain shortages for the equipment and supplies needed to provide medical care surged, raising the cost of providing healthcare even as providers submitted fewer claims for treatment. And since the pandemic, the situation has only worsened in the face of 12.4% inflation in the cost of medical supplies and labor over the past few years.

36.    More and more healthcare providers are operating on extremely slim or no margins. In 2023, nearly half of U.S. hospitals ended the year operating at a loss—with nearly 1 in 10 hospitals reporting margins of *negative* ten percent or worse. Providers are dipping into their reserves to ensure they are still able to provide patients with access to care, and as a result are delaying capital investments and improvements to their practices and facilities. This aging equipment and infrastructure has resulted in many healthcare providers' creditworthiness being downgraded, which makes it more difficult, if not impossible, for them to access credit to stay afloat.

37.    Making matters worse, reimbursement by government health insurance programs—Medicare and Medicaid—have long failed to keep pace with inflation. Although total

**Page 11 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

hospital expenses increased by 17.5% between 2019 and 2022, Medicare reimbursements for in-patient care increased only 7.5% over the same period. As a result, hospitals' Medicare margin sunk to a historic low of negative 12 percent—meaning that for every $100 a hospital spends to treat a recipient of Medicare, Medicare reimburses only $84. That, coupled with "increasing administrative burden due to inappropriate commercial health insurer practices"—some of which are described below—have left providers in sometimes dire straits.

38.     In 2020 alone, eighteen rural hospitals closed. Since then, another 36 have closed. A 2024 study by the Center for Healthcare Quality & Payment Reform reports that "[o]ver 300 rural hospitals are at *immediate* risk of closing because of the severity of their financial problems"—an increase of 50% from a year ago—and an additional 400 (collectively accounting for more than 30% of all rural hospitals in the country) are at risk of closing in the near future.

39.     Private medical practices are struggling in much the same way: their expenses are outpacing their reimbursements. A recent study by the American Medical Group Association revealed that the median loss by medical groups is $249,000 per provider. While revenue per physician has increased 9.1% since 2020, the median expense per physician has increased by a whopping 26.5%.

40.     Today, many healthcare providers are struggling to break even. More than ever, healthcare providers need competition between commercial health insurers to generate sufficient revenue to cover their costs and remain financially viable.

                   *ii.     Commercial health insurers are reaping record profits.*

41.     Commercial health insurers, however, continue to reap huge profits. While the COVID-19 pandemic devastated healthcare providers, it turned out to be a financial boon to the commercial health insurance industry.

**Page 12 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

42.     UnitedHealth, for example, earned over $25 billion in additional revenue and increased its operating margin in 2022. To start 2023, it increased its first quarter revenues by 13% year-over-year, contributing to the additional $12 billion its parent company, UnitedHealth Group, earned *in just that one quarter*, compared to the same quarter in 2022. By the end of 2023, UnitedHealth had increased its annual profits by $2 billion compared to the previous year.

43.     Elevance Health earned over $14.5 billion in additional revenue in 2023 compared to 2022. It also reported $8.5 billion in profits—an increase of $200 million compared to the previous year. Centene Corporation earned over $9.4 billion in additional revenue in 2023 compared to 2022. It also increased its annual profits by nearly $1.5 billion. CIGNA earned over $14.7 billion in additional revenue in 2023 compared to 2022 and increased its annual profits by $135 million in the same period. Health Care Service Corporation reported an increase in premium revenues of over $3.4 billion in 2022 compared to 2021, and increased its net income by over $240 million. Humana increased its annual revenue by over $13.5 billion in 2023 and reported an operating cash flow of nearly $4 billion. Kaiser Permanente increased its annual revenue by over $5.4 billion in 2023, reported over $4 billion in net income, and increased its operating margin.

2.     <u>Preferred Provider Organizations, or PPOs, are a popular form of health insurance.</u>

> i.     *PPOs grant patients greater freedom to choose their medical care providers.*

44.     Commercial health insurance is commonly sold in one of two familiar structures: Health Management Organizations, or HMOs, and Preferred Provider Organizations, or PPOs.

45.     An HMO is known for its rigid provider networks and lower costs. HMO plans will not cover medical care rendered by a provider outside of their network except in emergencies; and they often require health plan members (*i.e.*, patients) to obtain referrals from their primary care

**Page 13 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

doctor before seeing a specialist. Because an HMO plan offers greater predictability for insurers and less choice for consumers, it is typically available to patients at a lower premium compared to other types of plans.

46.     A PPO, on the other hand, provides members with flexibility and freedom in their medical care. PPOs cultivate large networks of physicians: these "in-network" physicians have contracted with the insurer offering the PPO plan and agreed to accept reduced reimbursement for their services in exchange for being marketed to the plan's members as "in-network." To entice plan members to see in-network healthcare providers, insurers offer members lower co-pay or co-insurance obligations. Therefore, that in-network healthcare provider is more likely to gain more business from being in-network. In effect, in-network providers offer insurers a volume discount.

47.     PPO plan members need not confine their medical care to only in-network healthcare providers: they are free to see any provider they choose. When a PPO plan member sees a doctor who has not contracted with their insurer, or who has contracted with their insurer for *some* medical procedures but not others, that care is considered "out-of-network" care. This means that care is not governed by any contractual agreement between the provider and the insurer. Because there is no contract governing the provision of the care provided or the reimbursement for that care, the provider and the insurer must negotiate after the services are rendered to agree upon a fair price for the providers' services.

48.     This freedom of choice in medical care is valuable to patients. For example, a patient might need to seek care while traveling in a location that does not have any in-network providers; necessary substance abuse or mental health treatment may not be available from an in-network provider; an out-of-network provider may have earlier available appointments to meet an urgent need; or a patient's primary care physician might determine that an out-of-network provider

**Page 14 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

will provide the patient with the best care. As a result, PPO plans are more popular than HMOs. According to one study, PPOs are the most common type of employer-provided healthcare plan, covering 47% of all covered employees.

49.     And because patients value the freedom afforded by a PPO, insurers are able to charge members higher premiums for a PPO plan than they can for an HMO. The average PPO plan established under the Affordable Care Act costs about $800 per year more than the average HMO plan for a 30-year-old subscriber. At the same time, insurers offering PPO plans encourage their subscribers to seek care from in-network providers, because in-network providers agree in advance to accept lower rates for their services.

> ii.   *Employer-funded commercial health insurance is lucrative for insurers.*

50.     Regardless of whether it is an HMO or a PPO, over 50% of Americans receive health insurance coverage through their employer. Employer-funded commercial healthcare can be distinguished based on who carries the risk of loss, and how an insurer profits from administering the plan. For both PPOs and HMOs, the risk of loss could fall on either the insurer or the employer.

51.     A plan that places the risk of loss on the insurer is often referred to as a "fully insured" insurance plan. For fully insured plans, an employer pays the insurer a fixed amount every month—usually calculated on a "per-employee, per-month" or "per-member, per-month" basis. The insurer is then responsible both for administering all aspects of the plan and for paying all covered medical expenses. The insurer therefore assumes the risk that the premiums received will be inadequate to cover all medical claims made by the employer's employees. But conversely, if

**Page 15 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

an insurer can keep the medical claims lower than the premiums received, it can keep the excess as profit.

52.     A plan that places the risk of loss on the employer, on the other hand, is often referred to as a "self-funded" plan, or an "Administrative Services Only," or ASO, plan. For ASO plans, the employer contracts with a health insurer and pays the insurer a negotiated fee to perform administrative services associated with the plan, such as communicating with healthcare providers, managing benefits enrollment, evaluating and processing claims, and facilitating the payment of benefits. But under this arrangement, the employer is responsible for paying all covered medical expenses. The employer therefore assumes the risks associated with its employees' medical claims rather than outsourcing that risk to an insurer. ASO plans are more common with larger employers that can spread risk over a large pool of workers and dependents. In 2022, 65% of covered workers were enrolled in a self-funded plan. Insurers profit from ASO plans by charging an employer fixed administrative fees, along with, sometimes, variable incentive fees for reducing costs.

> iii.     *Historically, out-of-network healthcare was priced using a "Usual, Customary, and Reasonable" benchmark.*

53.     In exchange for the higher premium paid by the subscriber, an insurer offering a PPO plan agrees to reimburse a substantial portion of the cost of out-of-network care.

54.     For decades, out-of-network reimbursement rates were determined by reference to a benchmark referred to as the "Usual, Customary, and Reasonable," or UCR, rate. A charge is considered "usual" if it represents a healthcare provider's usual charge for a specific medical procedure. It is "customary" if it falls within a range of fees that most healthcare providers in the relevant geographic area charge for that procedure. And it is "reasonable" if it is both usual and customary, or if it is otherwise justified because of special circumstances. Out-of-network

**Page 16 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

reimbursements were commonly expressed as a percentage of the UCR rate: a common reimbursement amount was 80% of UCR.

55.     Historically, databases of UCR rates were available from two companies. First, there was the Prevailing Healthcare Charge System (PHCS), a database first developed by the Health Insurance Association of America in 1974. Second, there was a company called Medicode, which maintained the Medical Data Research (MDR) database. Healthcare providers and insurers could consult either of these databases, or both, when determining a fair reimbursement for out-of-network reimbursement amount for services rendered.

> iv.     *Insurance companies offering PPO plans compete with one another based on the size and scope of their PPO networks, the percentage of out-of-network costs they cover, and the willingness of healthcare providers to provide out-of-network services.*

56.     In a competitive market, insurance companies offering PPO plans must compete for customers—whether plan sponsors or individual enrollees—based on their plan offerings.

57.     The size and scope of an insurer's PPO network is a significant factor differentiating plan options in the minds of potential customers because a larger and more comprehensive provider network means that plan enrollees have more options for in-network care at lower out-of-pocket costs.

58.     Insurers offering PPO plans can also differentiate their plan offerings based on the percentage of out-of-network costs they cover. Because the ability to obtain coverage for out-of-network care is a significant advantage of PPO plans, many customers are willing to pay higher premiums for access to out-of-network care. An insurer that is willing to reimburse a higher percentage of the costs of out-of-network care—particularly for a competitive premium—is more

**Page 17 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

likely to win a customer's business because the customer will have broader access to out-of-network care at a lower out-of-pocket cost.

59.     In addition to the percentage of out-of-network costs that insurers agree to cover under the terms of their plans (usually expressed as a percentage of the UCR), the ultimate amount that insurers pay to reimburse providers (which depends on the calculation of the UCR) plays an important role in competition among insurers. In an unmanipulated market, insurers have a competitive incentive to pay fair reimbursements to out-of-network providers. If an insurer's reimbursement rates are so low that an out-of-network provider cannot recoup the costs of providing care and earn a reasonable profit, the out-of-network provider is less likely to treat patients enrolled in that insurer's plans. That decreases the value of the insurer's plans to consumers and makes the insurer less competitive in the market. Paying consistently fair reimbursement rates also increases the likelihood that a provider will agree to join an insurer's PPO network in the future, which makes the insurer more competitive for the reasons stated above.

**B.    The MultiPlan Cartel perpetuated a scheme to collusively under-reimburse Healthcare Providers.**

60.     MultiPlan, as a company, has existed for more than 40 years. But its business, and the services it provides, have evolved over time. It started as a simple PPO network provider. Eventually, it grew and adapted to become the lynchpin in a massive, insurance industry-wide price-fixing scheme to underpay healthcare providers for services they provide to insurers' members.

1.    <u>MultiPlan 1.0: MultiPlan builds a massive database of claims data.</u>

61.     MultiPlan was founded in 1980. At its inception, it served as a vendor to insurance companies, offering access to a large PPO network of physicians.

**Page 18 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

62.     As MultiPlan has admitted in financial filings, in building and maintaining this PPO network, it "compete[s] directly with other independent PPO networks," including those "owned by large commercial payors"—that is, insurers. UnitedHealth has acknowledged the force of MultiPlan's competition: in sworn trial testimony, UnitedHealth's Vice President of Networks admitted that "MultiPlan has the largest network in the country.  They have a broad network. Broader than United."

63.     As described above, insurers offering PPO insurance plans must offer a network of contracted physicians. Building a PPO network requires considerable resources to negotiate agreements with each provider that the insurer hopes to bring within its network. And even those insurers who can spend those resources may find it difficult to build a comprehensive nationwide network.

64.     Insurers typically focus on building a robust network in the areas where their insured members work and reside—because that is where they will more often need access to medical care. But if an insurer's health plan member is injured while on vacation on the opposite side of the country from their home, they still need coverage. If a member from Massachusetts sprains their ankle while hiking the Grand Canyon, or a Brooklyn members' child attends college in California, that member would expect to be able to seek in-network providers in Arizona and California. Providers farther away from the bulk of an insurers' PPO membership are less likely to agree to an in-network volume discount, because the number of potential patients likely to select them to provide care would be much smaller.

65.     That is where MultiPlan, in its initial incarnation, came into play. MultiPlan built large, nationwide networks of providers, called "wrap networks" because they wrap around, and supplement, insurers' existing networks.

**Page 19 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

66.     MultiPlan competed with insurers offering PPO plans the same way those insurers competed with each other: by building robust nationwide networks of physicians willing to accept in-network levels of reimbursement. It then sold access to those networks to insurers, often for a set fee per member, per month. Insurers who purchased access to MultiPlan's PPO networks gained the ability to call the healthcare providers within MultiPlan's network "in-network" in their own PPOs, and the ability to outsource adjudication of claims from those providers to MultiPlan. Insurers could then tout the nationwide reach of their networks (comprised of their own PPO networks and MultiPlan's) to plan sponsors, and command high premiums for the privilege of accessing that network.

67.     When a healthcare provider agreed to join MultiPlan's network, it signed an agreement with MultiPlan. That agreement set forth the in-network compensation that the healthcare provider agreed to accept, the parties' understandings as to the terms of payment, and other important terms.[1] One of the terms set forth the conditions for a provider's "network participation and requirements." In some versions of MultiPlan's agreement with wrap network participants, the provision allowed MultiPlan, "in its sole discretion," to decide which wrap networks, if any, should include the provider, and noted that MultiPlan would allow insurers that rented access to that network to decide whether to treat that provider as in-network or not:

> 3.9  Network Participation and Requirements. MPI may, in its sole discretion, include Group and each Participating Professional as a Network Providers in any or all Network(s). Groups and each Participating Professional acknowledge that certain Programs offered by Clients accessing the Network (i) may not include a network option, or (ii) may cover Covered Services under the Participant's Program at an In-Network or out-of-Network benefit level.

---

[1]     The agreement's dispute resolution provisions do not require arbitration.

Page 20 of 96
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
U.S.D.C. (W.D. La.) Case No. _____
Original Class Action Complaint

This provision allowed an insurer to refuse to honor the rates agreed to between MultiPlan and the provider. Later versions of the agreement changed the language:

> Group and each Participating Professional acknowledge that Clients/Users [i.e., insurers] are not required to access (i) every Network, Network Provider, Group, or Participating Professional, (ii) Group or Participating Professional for every specialty service . . . or condition, or (iii) Group or Participating Professional when Client/User has access to Group or Participating Professional, either directly or indirectly, through a separate agreement.

This provision, too, allows insurers accessing MultiPlan's wrap network to opt out of treating a provider as in-network at their sole discretion.

68. A healthcare provider participating in MultiPlan's networks must submit any reimbursement claims for services provided to their patient's insurer. If that provider's services are not within the insurer's network, the insurer forwards that claim to MultiPlan to be adjudicated. If MultiPlan has included that provider in a wrap network accessed by the insurer, and so long as the insurer does not elect to cover the providers' services as an out-of-network benefit, MultiPlan instructs the insurer as to the contracted reimbursement amount agreed to by MultiPlan and the provider, and the insurer then sends that reimbursement to the healthcare provider.

69. The healthcare provider may, in the meantime, collect from their patient any co-payment or co-insurance required under the terms of the patient's health insurance plan. But to receive reimbursement as a member of one of MultiPlan's networks, the provider must agree not to balance bill the patient for the remainder of the bill—that is, any difference between the amount charged and the amount reimbursed under the terms of the contract.

70. Over the years, MultiPlan built robust nationwide networks with more than 1.2 million in-network healthcare providers and sold access to those networks to over 700 insurers, reaching more than 60 million health plan members. The vast size and scope of the network meant

**Page 21 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

that MultiPlan processed 370,000 medical claims a day, and amassed a database of 1 billion claims, representing an astounding 3.5 petabytes of data.[2]

71.    This database differed from either the UCR databases run by MDR and PHCS, and from the FAIR Health database described below. Those databases aggregated information about the claims made by doctors, while MultiPlan's database tracked the (lower) reimbursements doctors ultimately received on those claims. MultiPlan referred to this database as one of its two "crown jewels," and with good reason: this data would become essential to MultiPlan's next, and more nefarious, stage of development, as explained below.

    2.    <u>Ingenix: the insurance industry's first attempt at a conspiracy to underpay healthcare providers for out-of-network services.</u>

        i.    *The private health insurance industry commandeered the process for calculating the usual, customary, and reasonable price of medical care.*

72.    In 1996, UnitedHealth formed a wholly owned subsidiary called Ingenix. United then acquired both MDR (in 1997) and PHCS (in 1998) and merged their two UCR databases under Ingenix's auspices. For a decade after Ingenix's founding, the UCR database was controlled by health insurance giant UnitedHealth, a company with a clear incentive to depress reimbursement rates.

73.    Other insurers—which had the same incentive to depress reimbursement rates—quickly signed on to use Ingenix's new database and agreed to contribute to that database by sending their competitively sensitive claims and reimbursement data to their competitor, UnitedHealth's, subsidiary.

---

[2]    One petabyte of data is roughly equal to 500 billion pages of standard printed text.

**Page 22 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

74.     This created a closed-loop system for benchmarking reimbursements—and a clear conflict of interest. The data was provided by insurers with an incentive to depress UCR rates, maintained by an insurer with an incentive to depress UCR rates, and accessed by users with an incentive to pay as little as possible for out-of-network medical services. In a marked shift from the pre-Ingenix era, there was no longer any oversight from an entity outside of the insurance industry to ensure the accuracy of the data, and—since UnitedHealth purchased both legacy UCR databases—there was no other place to turn for this critical benchmark. UCR is supposed to fairly reflect the market rate for healthcare services across the country. But, following the rise of Ingenix, what was "usual, customary, and reasonable" was being decided by one company: UnitedHealth.

75.     Ingenix claimed that it imposed rigorous reporting requirements on its competitor insurers, and that it carefully and routinely audited the data, so that the database would accurately reflect UCR rates. It touted the database as transparent and fair. But it quickly became clear that was not true.

> ii.     *The New York Attorney General exposed Ingenix as a price-fixing conspiracy and shut it down.*

76.     In 2008, following increasing consumer complaints about large, surprise medical bills, the New York Attorney General launched an investigation into Ingenix. The investigation was soon followed by a lawsuit filed by the American Medical Association and an investigation by the U.S. Senate's Committee on Commerce, Science and Transportation.

77.     To cover up the market-wide, collusive manipulation of the UCR benchmark, insurers tried to mislead investigators, healthcare providers, plan sponsors, plan members, and the public. Federal and state investigators decried the "shocking lack of transparency and accuracy" from Ingenix and the insurers. For example, the New York AG reported that "[o]ne national insurer

**Page 23 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

filled an entire page with a list of alternative ways in which it purported to calculate out-of-network rates, in language that can best be described as gobbledygook"—when, it turns out, it could have just admitted that it simply "pa[id] the same rates for in-network and out-of-network care." Others continued to represent to plan sponsors and members that they calculated UCR reimbursement rates by reference to the PHCS database—which they failed to disclose had been purchased and gutted by an insurer—rather than acknowledge they were using a database run by a competitor.

78.     These investigations concluded that "the out-of-network system [was] broken." Although Ingenix and UnitedHealth touted their database as accurate, and insurers told their members they were using a benchmark that was independent and fair, Ingenix was, in fact, none of these things. As one of the lawyers leading the New York investigation later explained to the Senate Committee:

> Reasonable and customary rates are supposed to fairly reflect market rates, but our investigation revealed that Ingenix [was] nothing more than a conduit for rigged information that [was] defrauding consumers of their right to fair reimbursement for their out-of-network healthcare costs.

Although insurers promised plan members in their policy documents to reimburse based on UCR rates, they instead reimbursed "based on schedules compiled by one of their own, the nation's [then] second largest health insurer, which has an interest in depressing reimbursement rates." The Ingenix schedules were "unreliable, inadequate and wrong."

79.     Ingenix claimed to stand behind the integrity of its database. It claimed it ran "a number of analyses to check and make sure" that the data contributed by its competitors was accurate and complete.

**Page 24 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

80.     The New York Attorney General and Senate investigations found widespread manipulation of the data inputs to the Ingenix database—both by the insurers submitting data, and by Ingenix itself.

81.     Some insurers "scrubbed," or deleted, high value claims before submitting their data to Ingenix. Aetna, for example, eliminated the highest 20% of valid medical charges before sending its data to Ingenix. After Ingenix received that data, it itself scrubbed the data again—as it did with all data received—removing yet more high medical charges from the dataset before inputting it to the database.

82.     Another contributor, who submitted data for more than 5 million claims a month, did not submit true claims data. Instead, it "aggregate[d] the data in the relevant time period by zip code for each procedure code" and then "provide[d] Ingenix the average charge regarding each procedure." So, for a simple example, if the insurer had 5 claims for a procedure, one for $10, one for $20, one for $50, one for $80, and one for $90, the insurer averaged these values, and submitted to Ingenix five claims, each at $50. This sleight of hand dramatically distorted the distribution of charges in the database, as the Senate Office of Oversight explained: "if the insurer submitted an average cost of $75 for two medical procedures, Ingenix would have no way to determine if the charges that averaged to $75 were from an original distribution of $74 and $76 or from a distribution of $50 and $100." This flattening of the spread of charges, which the insurer applied to millions of claims every month, dramatically distorted the charges in the database, and could make a $100 charge seem like much more of an outlier than it actually was.

83.     Other insurers deleted any charges that reflected modifiers that indicated procedures or services with complications which would justify a higher than usual charge, making it appear as if more complicated procedures were less expensive than they actually were. Others

**Page 25 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

failed to collect information that affected the value of the service at all. Some insurers pooled data that should be kept separate, for example by aggregating the rates charged by nurses, physicians assistants, and physicians. And some salted their data with in-network claims—which were paid at lower-than-market rates agreed to by contract.

84. Ingenix claimed that any such manipulation was a non-issue because the company "r[a]n a number of analyses to check and make sure" that the data was accurate and complete. But as Ingenix executives were forced to admit (under oath), "Ingenix has *never* tested its results to determine if its statistical conclusions bear any relationship to the actual high, low, median, or 80th percentile or actual marketplace . . . rates charged by healthcare providers in any given area."

85. Ingenix purported to require its insurer contributors to "include all data fields that [the insurer] currently collects that are required in the data contribution format" for *all* claims it received, and prohibited contributors from "manipulat[ing] or present[ing] the data so as to provide only a particular subset of its data." But although it publicly claimed to stand behind the Ingenix data, behind the scenes, Ingenix and the insurers knew it was not accurate. Ingenix even admitted, in its private contracts with insurers, that the UCR data was provided "for informational purposes only," and that "[a]ny reliance upon, interpretation of and/or use of the Data by [an insurer] is solely and exclusively at the discretion of [that insurer]."

86. And Ingenix itself further manipulated the claims data after it was submitted by other insurers. It deleted the highest claims it received, and—when there was not sufficient data from which to derive a UCR for a given medical procedure in a given geographic location, it would make one up using a faulty methodology and data from dissimilar procedures or locations.

**Page 26 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

87.     As a result of these database manipulations, the Ingenix database underrepresented the market rate for health care services by up to 28%, translating into hundreds of millions of dollars of underpayment in just New York State alone.

### iii. Following Ingenix's demise, insurers were temporarily forced to use the FAIR Health Database.

88.     The fallout from the New York investigation was swift and severe. It prompted a series of lawsuits against insurers for their underpayment of out-of-network claims, which resulted in settlements of over $2 billion. For example, UnitedHealth alone agreed to pay $350 million to resolve a class action related to the Ingenix scheme, and Health Net agreed to pay $215 million to resolve a different suit.

89.     In early 2009, the New York Attorney General entered into a series of consent decrees with UnitedHealth and a total of 11 other insurers that participated in the Ingenix scheme, including Aetna, Cigna, and several other insurers who would later join the MultiPlan Cartel.

90.     For example, UnitedHealth settled with the New York Attorney General in a January 13, 2009, Assurance of Discontinuance. Among other things, UnitedHealth agreed to close the Ingenix database and contribute $50 million toward the creation of the database that came to be known as FAIR Health. UnitedHealth also agreed that, unless excused by the New York Attorney General, it would use the FAIR Health database to determine reimbursement rates for a period of five years, starting shortly after notification by the New York Attorney General that FAIR Health was available for use.

91.     The agreement between the New York Attorney General and UnitedHealth imposed several requirements on the insurer to wind down Ingenix. But in general, the New York Attorney General's settlements with the insurers required the insurers to stop using Ingenix, to

**Page 27 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

help fund the formation of a new, independent claims database, and to use that new database as their sole source of UCR benchmarking for five years.

92.     Following the New York Attorney General's settlements, FAIR Health was created as a non-profit company overseen by Syracuse University. FAIR Health was designed to collect, verify, and maintain insurers' claims data, and to calculate fair, transparent, and accurate UCR benchmarks for use by healthcare providers and insurers.

93.     Today, FAIR Health represents the gold standard in understanding health care cost and utilization, managing the nation's largest database of privately billed health insurance claims and all Medicare Parts A, B, and D claims data for 2013 to the present. To help determine benchmark rates, FAIR Health organizes claims data by procedure code and geographic area and employs a statistical outlier methodology to exclude extremely low and extremely high values that might otherwise distort the distribution of data.

94.     FAIR Health also serves its transparency mission by allowing consumers to input their ZIP code, select a specific medical procedure, and see an estimate of the in-network and out-of-network cost for that procedure.

95.     Given the ambitious nature of FAIR Health, it took some time to get the database up and running. The database eventually became operational in approximately January 2011. The insurers' five-year obligation to use FAIR Health ended in 2015.

96.     As insurers transitioned to the FAIR Health database, the reimbursement rates started to correct towards a fair, accurate UCR benchmark. For example, as the New York State Comptroller reported in 2020, the average UCR for medical and surgical procedures reimbursed by the state's Medicaid agency rose from an average of $204 per service in 2012 to $293 per service in 2016. Some, but not all, of this increase could be attributed to inflation; the remainder

**Page 28 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

reflected the market's slow correction away from Ingenix's manipulated benchmarks to the fair and accurate benchmarks produced by FAIR Health.

97.     When insurers' obligations under their settlements with the New York Attorney General to use the FAIR Health database lapsed, insurers still had the same incentive to collude to depress out-of-network reimbursement rates. But now, the prior vehicle for that collusion—Ingenix—was no longer available. MultiPlan filled in this gap.

3.      <u>MultiPlan 2.0: MultiPlan conspires with its insurance-company competitors to depress and fix the cost of out-of-network medical services.</u>

98.     The market correction as Ingenix receded into the past was a good thing for healthcare providers, who began receiving fairer reimbursements for the services they provided. It was a good thing for consumers, who saw fewer, and smaller, surprise balance bills necessitated by their insurers' underpayments. But the demise of Ingenix and the obligation to use FAIR Health left insurers without a means to avoid paying healthcare providers a fair reimbursement for the often life-saving out-of-network services provided. As MultiPlan's then-CEO Mark Tabak stated during an August 2020 Virtual Analyst Day in the buildup to MultiPlan going public, the insurers viewed this as a "major area of concern"—a "pain point."

99.     In or around 2009, when the New York Attorney General announced the results of its investigation into Ingenix, MultiPlan identified an impending gap in the illicit market for claim-suppressing services that insurers wanted. So the company launched what it would call "MultiPlan 2.0," using its massive database of reimbursement data as a starting point.

100.    As Mark Tabak described this evolution to investors in 2020:

> [In] MultiPlan 1.0, we built the largest independent contracting network focusing on managing out-of-network expense. We've also aggregated an incomparable database of claims, charge, and provider credentials. MultiPlan 2.0 began to leverage the data by

**Page 29 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

expanding our offering into Analytic-Based and Payment Integrity Services.

As time would show, MultiPlan accomplished its goals for MultiPlan 2.0 through acquisitions.

101. In 2010, MultiPlan acquired a company called Viant. Viant was a healthcare payment solutions company that offered insurers auditing and reimbursement services for medical claims and costs. Generally, Viant "used algorithms to recommend reimbursements. But for some types of care, Viant's calculations used a database of billed amounts. So if medical providers charged more over time, the recommended payments were also likely to rise."

102. In 2011, MultiPlan acquired National Care Network for just $50 million. National Care Network had developed an alternative strategy for formulating reimbursement rates. "Rather than start with a bill and negotiate it down," National Care Network's approach was to "calculate the cost of care and negotiate it up." National Care Network's primary asset was a since-patented claims repricing tool, called Data iSight—and that asset, in the words of Mr. Tabak, "became the foundation of [MultiPlan's] analytics business."

103. In 2014, MultiPlan acquired Medical Audit & Review Solutions ("MARS"), a company that can review medical bills line by line to identify errors or invalid claims. Like MultiPlan, MARS sought to use analytics to reduce commercial insurers' reimbursements to providers.

104. After acquiring Viant and NCN, MultiPlan continued to describe Viant's repricing tools and Data iSight as two distinct products. Sometimes MultiPlan or other members of the Cartel referred to the reimbursements offered as recommended by Viant; others referenced National Care Network; and yet others referred to Multiplan. This effort to obfuscate MultiPlan's consolidation

**Page 30 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
*U.S.D.C. (W.D. La.) Case No. _____*
*Original Class Action Complaint*

of the market for "claims repricing" services was so successful that some providers did not even realize that Viant and Data iSight were both owned by MultiPlan.

105.    But in reality, under MultiPlan, the company operated both in the same manner: rather than start from the commonly used UCR benchmark and negotiate down, MultiPlan's "repricing" tools depressed reimbursements severely by starting from the cost of the medical care provided, adding a small margin, and forcing providers to try to negotiate up.

106.    These acquisitions constituted MultiPlan 2.0, and MultiPlan referred to them as its second "crown jewel": by adding these three companies as subsidiaries, MultiPlan would generate an additional approximately $436 million in additional revenue by 2020. And very quickly, Data iSight became MultiPlan's top money-maker among its large insurer clients, including Insurer Defendants.

*i.      How the MultiPlan Cartel claims Data iSight works.*

107.    According to MultiPlan, Data iSight is proprietary technology that brings "order, efficiency, affordability and fairness" to the healthcare system through cost management solutions that ensure reasonable medical expenses for insurers, while protecting the insurers' members from balance billing.

108.    According to MultiPlan, this is accomplished by subjecting healthcare providers' out-of-network bills to a proprietary algorithm that "reprices" the claim to be more in line with typical reimbursements. Both MultiPlan and its co-conspirators tout the company as "an independent third-party vendor" that "applies proprietary logic to arrive at a recommended rate" of reimbursement using "a pricing tool that . . . calculate[s] a 'fair' reimbursement."

109.    When an insurer receives an out-of-network claim from a healthcare provider, it forwards that claim to MultiPlan for adjudication. When MultiPlan receives that claim, it processes

**Page 31 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

it through Data iSight's proprietary algorithm, which provides what MultiPlan calls "reference-based pricing."

110.    According to MultiPlan, that algorithm accounts for the location, size, and type of the healthcare provider; the severity of the medical condition treated; the resource-intensity of the procedure, and the costs of and reimbursements to healthcare providers providing the same treatment for the same condition. That is, MultiPlan claims, its algorithm adjusts its recommended reimbursement according to whether a healthcare provider is from a practice or a hospital; whether it is a small local facility or a large hospital system; whether the provider practices in a rural, suburban, or urban setting; and whether it is a public hospital, a private hospital, or an academic "teaching" hospital, among other factors.

111.    According to MultiPlan, the algorithm adjusts each of these comparator claims to remove the effect of local and regional costs of living, averages these claims together to arrive at a benchmark, and then adjusts that benchmark according to the cost-of-living index for the billing provider's location.

112.    For in-patient claims—claims related to medical care requiring a hospital stay—the algorithm classifies the medical procedures in the providers' bill according to their Refined Diagnosis Related Group (or rDRG)—a claim-sorting system that classifies the treatment according to its severity and complexity, taking into account the comorbidities and complications that occurred in treatment, to derive the cost of providing that service. It then identifies all "like" hospitals with claims data for a comparable claim to create a benchmark for the cost of providing that service. Its reimbursement "recommendations" reflect this benchmark, plus a small margin, adjusted according to the providers' locality's wage index (a measure of the local cost-of-living).

**Page 32 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

MultiPlan represents that its Inpatient Module uses a database that represents "approximately 75% of all inpatient discharges in the United States" but "does not include any [Ingenix] data."

113.    Out-patient treatment claims are processed by the algorithm differently, because medical billing does not use rDRGs for out-patient treatment. Instead, Data iSight uses the HCFA Common Procedure Code System (or HCPCS) to determine the cost of out-patient care. A single medical bill for out-patient care may contain many itemized lines, identified by an HCPCS code for different aspects of the care provided. Data iSight processes out-patient claims by benchmarking each HCPCS code to the median cost for that specific HCPCS code in MultiPlan's database. As with inpatient care, a narrow margin is added to that median cost, and the sum is then adjusted for the billing providers' local wage index. Data iSight then adds together the wage-adjusted median cost for each line of the bill to yield a "recommended" reimbursement.

114.    According to Multiplan, this process—whether for an in-patient or out-patient claims—yields a "recommended payment" that the insurer is free to accept or reject, and MultiPlan then returns that recommendation to the insurer.

115.    According to MultiPlan, if the insurer agrees with this "recommended" reimbursement, it then conveys the offer to the provider. MultiPlan publicly claims the recommended reimbursements are accepted by providers in an overwhelming majority of cases—MultiPlan has estimated that providers accept the offer between 93% and 99.4% of the time. But if a provider refuses to accept the offer, MultiPlan claims to negotiate in good faith with the provider on an insurer's behalf.

ii.    *How the MultiPlan Cartel actually used Data iSight.*

116.    Although members of the MultiPlan Cartel refer to their price-setting mechanism as an "algorithm," the reimbursement amounts offered to physicians are not a result of an

**Page 33 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

algorithm. Although they claim to adjust for the local cost-of-living where the provider is located, they do not. Although they claim that the reimbursement value MultiPlan returns to insurers is then forwarded to the provider merely as a "recommendation," it is not. And although MultiPlan claims to negotiate with providers dissatisfied with the reimbursement offered, they do not—or at least they do not negotiate in good faith. Regardless, the MultiPlan Cartel's price-setting mechanism functions to lower the start of negotiations with providers.

117.    How MultiPlan's repricing scheme really works is described below.

        a.    MultiPlan and its co-conspirators secretly agree upon a price for service independent from the Data iSight algorithm.

118.    When MultiPlan receives a provider's claim for payment forwarded by an insurer, it does subject the claim (initially) to an algorithm similar to the one described above. But what MultiPlan does *not* disclose—and what members of the Cartel have historically kept well hidden from providers, plan sponsors, patients, and the public—is that *after* running the algorithm, MultiPlan secretly manipulates the algorithm's results on behalf of the insurer by imposing what it calls "overrides."

119.    When an insurer first joins the MultiPlan Cartel, it signs an agreement with MultiPlan. As part of that agreement, the insurer agrees that it will work with MultiPlan to select a secret price it will pay providers. The agreement contemplates that this secret rate will be determined according to business criteria mutually agreed upon between the insurer and MultiPlan. That secret rate could be either a fixed dollar value or benchmarked to a percentage of the prevailing Medicare reimbursement rates.[3]

---

[3]    Medicare's reimbursement rates are far lower than standard reimbursements that would be offered by insurers in a competitive market. They are lower even than the manipulated rates insurers paid out when participating in the Ingenix scheme in the early 2000s.

**Page 34 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

120. As MultiPlan explains in a secret white paper available to members of the Cartel and to potential Cartel members:

> In accordance with preselected parameters set by the client to meet its business needs, the initial target reimbursement amount is calculated by applying the median benchmark costs and applying an additional margin factor. Any applicable override rules . . . are then applied to arrive at the recommended reimbursement amount.

121. The mutual agreement required by the contract ensures that MultiPlan can exert a measure of control upon each of the insurers that joins the Cartel; keeping them aligned in their payment amounts, and gradually decreasing those amounts over time to further the Cartel's goals.

122. Internal documents and sworn testimony from UnitedHealth and its executives show how the scheme worked in real time, using emergency room charges as an example. When UnitedHealth joined the MultiPlan Cartel, it collaborated with MultiPlan to choose its overrides. It settled on two initial overrides, which it misleadingly referred to as a floor and a ceiling: the "ceiling" was 500% of Medicare reimbursement rates; and the "floor"—or the amount that UnitedHealth claimed was the least it would pay—was 350% of Medicare reimbursement rates.

123. The MultiPlan Cartel chose to use rates tied to Medicare rates for public relations reasons: it sounded like a large, benevolent number, and 500% of Medicare rates sounded more generous than 80% of UCR. As MultiPlan instructed its co-conspirators, paying even just 120% of the government-set Medicare rates "sounds fair, maybe even generous," but these rates were "inherently misleading" because "the average consumer does not understand just how low Medicare rates are. This allowed them to paint physicians' bills as exorbitant—more than 5 times what the government says their services are worth—to create a narrative that the MultiPlan Cartel's collusive price-fixing was necessary to combat greedy medical professionals. (Consistent with the

**Page 35 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

Cartel's plan to surreptitiously lower reimbursements over time, UnitedHealth would lower its ceiling from 500% in 2016 to 350% in 2018, and then later to 250%.)

124.    In sworn testimony, UnitedHealth's former Vice President of Out-of-Network Programs, John Haben, described the "waterfall" that out-of-network bills would be subjected to after an insurer selected its secret overrides. When UnitedHealth received a bill for services that were outside of its PPO network, it forwarded that bill to MultiPlan. MultiPlan then checked whether the provider's services fell within the MultiPlan wrap network in which UnitedHealth participated. If so, it would test the billed charges against UnitedHealth's chosen "ceiling" override. If the contracted rate for that bill amounted to less than 500% of Medicare reimbursement rates, MultiPlan would advise UnitedHealth to pay that contracted rate. But if the contracted rate was higher than that ceiling, MultiPlan would attempt to negotiate with the provider on UnitedHealth's behalf. If negotiations were unsuccessful, MultiPlan would then subject that bill to the Data iSight algorithm.

125.    The algorithm—which used the actual cost of providing the service as a starting point and added a small margin—was doomed to produce a number lower than 350% of Medicare reimbursement rates. As noted above, Medicare reimbursement rates are low: 84 cents on every dollar a healthcare provider spends treating a patent. So, on average, the cost of providing care was 119% of Medicare's reimbursement rates. Adding a small margin to the cost of providing services would yield an algorithmically recommended reimbursement lower than overrides insurers set.

126.    When the algorithm inevitably delivered a too-low repricing recommendation, MultiPlan Cartel members agreed, MultiPlan would set the reimbursement level as the insurer's hand-picked "override." Thus, UnitedHealth, for example, would (almost always) pay healthcare providers for 350% (later 250%) of Medicare's too-low reimbursement rates. And on the off-

**Page 36 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

chance Data iSight produced a claims value higher than the insurer's preferred "ceiling" override, members of the Cartel agreed that MultiPlan would "apply the [ceiling override] on a claim as the final price."

127.    Other insurers used the same rationale to set their secret overrides. Cigna, for example, set its "ceiling" at 400% of Medicare rates—meaning pay out-of-network charge for more than 400% of Medicare was shunted into the Data iSight "algorithm." It then targets an even lower allowable charge.

128.    So, the "floor" set by Cartel members in consultation with MultiPlan was not just a floor—it was also a ceiling. The MultiPlan Cartel did not use the Data iSight algorithm to generate fair or reasonable reimbursement recommendations; it used it to ensure that the insurer co-conspirators could fix the exact amount they wanted to pay doctors, and then disguise that amount as a legitimate, algorithmically derived payment.

129.    Returning to UnitedHealth as an example, this methodology allowed insurers to dramatically underpay healthcare providers. When UnitedHealth used FAIR Health's transparent and accurate UCR benchmarks, it paid providers an average of 60% to 70% of their billed charges. When UnitedHealth used MultiPlan's corrupt methodology and secret override of 350% of Medicare rates, Mr. Haben testified, its payments fell to 31–40% of billed charges. And when UnitedHealth slashed its "floor" ceiling to 250% of Medicare, its payments fell to 25% of the billed charges.

130.    For its part, MultiPlan claimed these overrides functioned as "guardrails that ensure a reimbursement never strays below or above a benchmark." In reality, the overrides provided a means of covertly fixing prices at exactly what insurers wanted to pay. In one of its secret white papers available to co-conspirators and other insurers considering joining the conspiracy,

**Page 37 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

MultiPlan claimed that its methodology assured that the recommended reimbursements generated by the Data iSight algorithm would never be lower than "the amount at which 75% of hospitals in the benchmark group would be profitable." But even if that information weren't a tightly guarded secret among MultiPlan Cartel members, it would be cold comfort to healthcare providers to know that they would "only" lose money treating Cartel members' patients 25% of the time.

> b.     MultiPlan allows insurers to target specific treatments for extreme underpayment.

131.    In addition to its large PPO wrap networks and sham algorithmic claims processing programs, MultiPlan advertises what it calls payment integrity services. MARS and a more recent MultiPlan acquisition, called ProPricer, are at the core of this function. MultiPlan claims these services are intended to root out "clinical errors, waste and abuse, and at times fraud;" to "correct invalid codes" and disparities between the reported age or sex of a patient and the treatment received; and to address any DRG codes that could not be assigned to a relevant group of treatments.

132.    But that is not the (only) way MultiPlan deployed these resources. MultiPlan allows its co-conspirators to identify treatment codes that they did not want to pay for, even if the service rendered was medically necessary. Sometimes, insurers targeted specific treatments and paid even less than Medicare rates (the same rates that are 12% less than the cost of providing services). For example, a recent New York Times exposé discussed the plight of a mental health care professional that treated children with autism. She charged the same rates that the state of Virginia paid for treating Medicaid patients; but after running her bills through MultiPlan's scheme, insurer Aetna's subsidiary Meritian Health, informed the provider that it would pay less than half of Virginia Medicaid's already low rates.

**Page 38 of 96**
***Center for Orthopaedics and Spine, LLC, d/b/a***
***The Orthopaedics Center, et al. v. MultiPlan Inc., et al.***
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

133. Insurers could even create "hit lists" of specific providers to target for especially deep discounts or outright denials. Cigna did this with certain substance abuse treatment centers in 2015: it targeted specific billing codes commonly used by substance abuse treatment centers, worked with MultiPlan to create a "workaround," and very quickly set itself on a "pace for a nearly 90% reduction in paid claims" in just two weeks. This use of MultiPlan's offerings was so successful, it planned to target even more substance-abuse treatment codes in the near future.

134. When coupled with the secret caps on reimbursements set by the MultiPlan Cartel, these ironically named payment "integrity" services further suppressed reimbursements for out-of-network treatment.

> c. MultiPlan's pricing recommendations do not take into account geographic differences in cost of living.

135. Any legitimate manner of calculating out-of-network reimbursements by commercial health insurers would take into account the geographic differences in the cost of providing medical care. The cost of living, and therefore wages, varies widely state-by-state; and within states, it varies according to whether an area is urban, suburban, or rural. An hour of a physician's time generally costs more in New York City, New York than it does in New Elm, Georgia. The cost of medical supplies varies widely as well, based on the size of the facility (smaller communities tend to have smaller hospitals) and the transportation costs of delivering those supplies to the provider (transportation costs are lower in the port city of Boston, Massachusetts than in the landlocked township of Boston, Ohio).

136. Although MultiPlan claims its algorithm takes these regional differences into account by applying a wage index adjustment before recommending a reimbursement, the

**Page 39 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

MultiPlan Cartel does not adjust its secret payment criteria in the same manner: it offers the same payment regardless of where medical care is provided.

137.    For example, consider eight emergency room physicians' bills for moderately complex emergency room services across the country in a four-month period in 2019. The providers of those services billed one of two insurers, UnitedHealth and BlueCross & BlueShield, for those services:

    a.    On January 21, an emergency physician in Wyoming charged $779;

    b.    On January 25, an emergency physician in Arizona charged $1,212;

    c.    The same day, an emergency physician in New Hampshire charged $1,047;

    d.    On February 8, an emergency physician in Oklahoma charged $990;

    e.    On February 10, an emergency physician in Kansas charged $778;

    f.    The same day, an emergency physician in New Mexico charged $895;

    g.    On March 25, an emergency physician in California charged $937; and

    h.    On May 20, an emergency physician in Pennsylvania charged $1,094.

138.    Upon information and belief, because UCR rates are indeed usual and customary, and because industry standard had been, until the rise of the MultiPlan Cartel, used to benchmark claims to UCR rates, each of these bills represented a charge for UCR, adjusted for the hospitals' locations.

139.    After subjecting the providers' bills to MultiPlan's Data iSight algorithm and applying the secretly agreed upon pricing overrides, MultiPlan recommended, and UnitedHealth and Blue Cross paid, the same amount *down to the penny* for every one of those treatments: $413.39. MultiPlan and its insurer partners did not adjust this amount to account for the fact that

**Page 40 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

the cost of living varied greatly among the locations where service was provided, despite their representations to providers, plan sponsors, patients, and the public to the contrary.

140.     These $413.39 payments, derived by the MultiPlan Cartel by collusive agreement, represented between 46% and 66% less than a usual, customary, and reasonable payment calculated using a fair and independent benchmark, like FAIR Health's.

        d.     MultiPlan's repricing "recommendations" are actually binding commandments.

141.     In its role as the Cartel's "mafia enforcer," MultiPlan forbids an insurer from undercutting the aims of the MultiPlan Cartel by offering to pay anything other than the "recommendation" MultiPlan generates.

142.     If MultiPlan negotiates on the insurer's behalf, the agreement between MultiPlan and the insurer provides that the insurer "*shall* pay the healthcare provider in accordance with  the . . . negotiated reimbursement amounts negotiated by" MultiPlan. And even when MultiPlan has not negotiated, other sections of the agreement forbid an insurer from paying less than what MultiPlan "recommends." This, functionally, guarantees the insurer will always pay exactly what MultiPlan commands it to—because if the provider has not disputed MultiPlan's recommendation, the insurer has no incentive whatsoever to pay *more* than the amount the healthcare provider has accepted. So insurers accept MultiPlan's "recommendations" and offer them to healthcare providers without alteration.

        e.     MultiPlan does not negotiate with providers in good faith.

143.     In financial documents, marketing materials, and other publications, MultiPlan touts high acceptance rates by healthcare providers as evidence that the reimbursement amounts it generates through its Data iSight scheme are considered fair and reasonable by physicians.

**Page 41 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

144.    On its website, MultiPlan says that its Data iSight reimbursement rates are accepted by providers 96% of the time and facilities 93% of the time, "making it a defensible methodology for payors." In a 2018 study, MultiPlan boasted of even higher acceptance rates, comparing acceptance rates to the "savings" insurers received. For inpatient care, MultiPlan slashed 53% off of providers' bills, and yet providers accepted the Cartel's reimbursement offers 99.4% of the time. For outpatient care, Multiplan slashed 75% off of providers' bills, and yet providers accepted this treatment 98.7% of the time. And for professional care, MultiPlan slashed 69% off of providers' bills, and enjoyed a 94.5% acceptance rate.

145.    But make no mistake: these acceptance rates do not reflect healthcare professionals' acknowledgement that the MultiPlan Cartel's reimbursement offers were fair. Rather, they reflect the cold reality that, except in some unusual circumstances, healthcare providers have no choice but to accept the suppressed rates. First, there is the sheer volume of claims that providers would have to dispute. With almost all insurers (and all the major ones) using MultiPlan, providers would have to negotiate every single bill, individually. Most healthcare providers, especially small local practices like Plaintiff's, lack the resources to undertake a claim-by-claim negotiation for every single patient they see. Second, healthcare providers have no other option. Because more than 700 of the country's 1,100 health insurers have agreed not to compete with each other, and instead to underpay healthcare providers, a provider dissatisfied with the Cartel's reimbursement offerings cannot simply stop seeing the patients of one outlier insurer with unreasonably low rates. It is almost the entire industry. If a provider were to stop seeing patients from every offending insurer, that provider would have no patients.

146.    Often, healthcare providers cannot negotiate: MultiPlan allows its Cartel members to instruct it not to negotiate *at all*, or to negotiate only within a very narrow window of potential

**Page 42 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

reimbursement rates. This is what Cigna does, for example: according to a Cigna representative's sworn testimony, Cigna imposed "predetermined" "parameters" within which MultiPlan could negotiate with providers.

147.    When providers *do* negotiate with MultiPlan, they risk the very real possibility that they will fare even worse. If a provider refuses to accept the reimbursement rate generated by MultiPlan's Data iSight scheme, MultiPlan attempts to impose an even lower rate on the provider. For example, in one fax to a doctor, MultiPlan threatened that if the provider refused to accept the "proposal" "this claim is subject to a payment as low as 110% of Medicare rates based on the guidelines and limits on the plan for this patient." Others have reported deadlines of mere hours to accept outrageously low MultiPlan Cartel offers. Healthcare practices and their billing specialists say that MultiPlan has followed through on these threats.

148.    As one analyst has observed, when remarking on MultiPlan's negotiation strategy:

> MultiPlan's key strategy for forcing doctors to accept low prices is by erecting a bureaucratic layer so thick and complicated that few can navigate it . . . . MultiPlan preys on physicians using subtly forceful [communications], expecting physicians' medical billing staff to not have time to fight through layers of bureaucratic tape.

149.    The short time frame for a response offered by the MultiPlan Cartel also effectively prohibits healthcare providers from obtaining more information about the artificially depressed offers for the care they provide. If a healthcare provider or their billing agent calls in with questions about an unexpectedly low reimbursement amount, MultiPlan representatives allow that individual only five questions before hanging up on them, regardless of whether the representative can even answer the questions. And if a provider persists in attempts to secure a fair payment, MultiPlan often drags the process out, and Cartel members delay payment to the provider. As one woman in charge of billing for a healthcare provider put it: "It's not a real negotiation." In its role as a "mafia

**Page 43 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

enforcer for insurers," MultiPlan gives providers an "offer" they cannot refuse—accept the cut-rate reimbursement or watch it be cut even further.

150.    To further frustrate negotiation efforts, the Cartel refuses to allow providers to negotiate with insurers directly: all communications must go through MultiPlan. MultiPlan controls the entire out-of-network claims handling process for these payors—from setting the reimbursement rate and sending it to the provider to "negotiating" any changes to the rate and satisfying the claim. And to ensure reimbursements remain low even for those providers that persevere in attempts to negotiate, MultiPlan ties its employees' bonuses to the size of the reductions, which inspires MultiPlan's negotiators to force providers to accept payments they knew were not fair.

151.    The non-MultiPlan payors have outsourced not only pricing decisions, but also claim collection, to MultiPlan, as a consequence of their agreement to provide MultiPlan with real-time claims data. Yet at the same time, it will refuse to negotiate with a provider to reach a payment level above the secret caps imposed by members of the conspiracy, claiming that it cannot authorize greater payment because it is not the insurer. This charade occasionally, and intentionally, gives providers nobody with whom to negotiate.

4.    The MultiPlan Cartel conspires to fix prices for out-of-network reimbursements.

152.    Insurers flocked to MultiPlan, eager to sign up for this scheme. As soon as large insurers like Aetna, Cigna, and UnitedHealth ran out the clock on their mandatory five-year obligation to use FAIR Health, they quickly abandoned FAIR Health's accurate, transparent, and impartial pricing mechanisms to exploit Data iSight's sham algorithm and set their own low prices for medical care. UnitedHealth was one of the last major insurers to join the Cartel: it joined in 2016 and broadly rolled the program out to its clients by July 1, 2017.

**Page 44 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

153. The members of the MultiPlan Cartel conspired together to fix prices for the reimbursement of out-of-network medical services, because the lower they could suppress those prices, the more money they all stood to make. So they agreed in writing to coordinate their reimbursement strategies, rather than to compete; and agreed in writing on a common methodology by which to do so. They exchanged confidential business information which, in a competitive market, they would have jealously guarded from their competitors. And they capitalized on numerous opportunities to collude, often meeting to openly discuss how to further their scheme. MultiPlan sat at the center of this conspiracy, acting as the enforcer to ensure that the Cartel could escape detection, and preventing any attempts by Cartel members to break off and restore competition in the marketplace.

154. Together the Defendants accomplished levels of claim suppression—and enjoyed handsome profits—that they could not have accomplished acting in their own self-interest. The Cartel has been even more successful than attempts by the Insurer Defendants to fix and suppress out-of-network reimbursements in the past (i.e., through Ingenix). This is thanks, in part, to the fact that the health insurance industry is highly concentrated (the top 15 insurers control 66% of the market), with high barriers to entry; and in part due to the fact that MultiPlan patented its sham Data iSight algorithm in order to prevent competition until at least 2029.

155. The inference of a conspiracy by the MultiPlan Cartel is supported by both direct evidence of a conspiracy (such as the written agreements, information shared and communications between co-conspirators, and public statements to healthcare providers and investors), and circumstantial evidence (such as their prior history of collusion, the high levels of concentration in the health insurance market, and the Cartel's many opportunities to collude). Much of this evidence that is presently available comes from internal documents from and sworn testimony by

**Page 45 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

the executives of MultiPlan and UnitedHealth made public in a recent trial in which UnitedHealth was found liable for underpaying one physicians' group by using MultiPlan's repricing methodology; and from the internal documents of Cigna, made public in another lawsuit. On information and belief, the other Insurer Defendants and their co-conspirators engaged in the same conduct alleged herein, and discovery will produce additional evidence of their conspiracy.

    i.    *Members of the MultiPlan Cartel have a motive to collude.*

156.    Defendants share the same financial motivation to suppress reimbursement payments for out-of-network services, because all members of the MultiPlan Cartel make more money the lower they can suppress out-of-network claims reimbursements. As MultiPlan explained in an internal presentation to members of the Cartel: the Cartel's incentives are "completely aligned."

157.    MultiPlan is paid a percentage of the spread, or the underpayment to healthcare providers (ordinarily between 5–7%). MultiPlan only makes money for its "repricing" and "data integrity" services if the Cartel is successful in suppressing out-of-network reimbursement payments. The more MultiPlan suppresses reimbursements, the more MultiPlan makes.

158.    Similarly, the Insurer Defendants are incentivized to suppress payments to healthcare providers to increase their own profits. For ASO clients, the Insurer Defendants receive a "shared savings fee" or "processing fee" representing a percentage of the spread. For fully funded plans, the insurance company collects a fee and makes money by spending less than that fee. With either type of plan, the Insurer Defendants make more money the more than claims are suppressed.

159.    Sometimes Defendants suppress payments to healthcare providers so much that the fees that MultiPlan and the Insurer Defendants charge for these "savings" exceed the amount the provider receives for providing medical care. For one example, when a medical facility providing

**Page 46 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

outpatient substance abuse treatment received $134.13 on a claim, Cigna, the payor, received $658.75—nearly five times as much as the provider—as a processing fee. And MultiPlan received $167.48—more than the provider—for its role in suppressing the claim. This perverse example is just one. Court records show that this pattern frequently repeats itself. Indeed, Cigna received $4.47 million in processing fees from employers related to addiction treatment claims in California. MultiPlan received $1.22 million for its role in repricing those claims. The providers received just $2.56 million.

160.     Defendants also have a motive to conspire with MultiPlan to avoid the legal issues like those created by their use of Ingenix. For example, in an internal email Cigna Chief Risk Officer Eva Borden explained that Cigna "cannot develop these charges internally (think of when Ingenix was sued for creating out-of-network reimbursements)." Rather, Cigna "need[ed] someone (external to Cigna) to develop acceptable" reimbursement rates. MultiPlan gladly, greedily, and anticompetitively complied.

161.     MultiPlan implies that its repricing tools create a legally permissible scheme by offering to enter into formal contracts for those services, regardless of the truth that conspiracy agreements of this kind are disincentivized by American law.

ii.     *Insurers that joined the MultiPlan Cartel agreed in writing to fix prices.*

a.     MultiPlan and Insurers admit to entering into contracts that contain provisions regarding the MultiPlan Cartel's "repricing" scheme.

162.     MultiPlan has entered into contracts with over 700 healthcare payors and has told investors that it "is a Core Strategic Partner to All Top Commercial Payors." Nearly all of those contracts—including those with all of the major health insurers—include provisions regarding MultiPlan's repricing and "data integrity" services. In those provisions, MultiPlan and its co-

**Page 47 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

conspirators agree to use MultiPlan's repricing technologies to suppress payments on out-of-network healthcare claims and to split the revenue generated by this underpayment.

163. These agreements set forth in detail how insurers will submit or transmit the out-of-network claims they receive to MultiPlan, how MultiPlan will handle the claims once it receives them, and what repricing method would be used. Each also incorporates by reference MultiPlan's "Data iSight Preferences form," which sets forth the "overrides" that the insurers and MultiPlan selected to apply to their claims. In other words, MultiPlan and its co-conspirators have entered into agreements that explicitly discuss the methodology they will use to fix prices for out-of-network services. MultiPlan ensures that all of its commercial health insurer customers comport with a uniform process.

164. MultiPlan openly admits to—brags about, even—entering into these agreements with its competitors. In financial filings, and in investor calls where MultiPlan hopes to attract new shareholders and money, MultiPlan touts the number and scope of its contracts:

> We believe we have strong relationships with our customers, which include *substantially all of the largest health plans* and their ASO platforms. Contract terms with larger customers are *often three years and as many as five years*, while mid- to small-sized customer contracts are often annual and typically include automatic one-year renewals. We continue to experience *high renewal rates* and our top ten customers based on full year 2023 revenues have been customers for an average of over 20 years. Our customer relationships are further strengthened by the fact that MultiPlan is electronically integrated with its customers in their time-sensitive claims processing functions, and we support highly flexible benefits offerings to an extensive group of customers who often feature a MultiPlan logo on membership cards when our networks are used.

165. Insurers, too, admit to the existence of these agreements to healthcare providers, informing providers that they have "contracted with MultiPlan to facilitate resolution of the above referenced services due to the Provider being out of network for this claim."

Page 48 of 96
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
U.S.D.C. (W.D. La.) Case No. _____
Original Class Action Complaint

b.     Each insurer in the Cartel enters into the agreement knowing that its competitors have done the same, on substantially the same terms.

166.     Every Cartel member knows that its competitors have entered into substantially the same agreement with MultiPlan.

167.     They know that the agreements require their competitors to use the same methodology—deploying the Data iSight "algorithm" to justify pricing claims according to their handpicked overrides—to fix the price of out-of-network healthcare.

168.     From the language of the agreements, they know that MultiPlan colludes with their competitors, the same way MultiPlan colluded with them, to ensure that the Cartel picks similar (even if not identical) overrides. Each member of the Cartel agreed to pick their overrides in collaboration with MultiPlan, which gave MutiPlan the ability to advise the Cartel members on how best to align their overrides with those of other Cartel members.

169.     They know that their competitors have all agreed to share their data with MultiPlan to facilitate Data iSight's operations. So they know that they will benefit from their competitors' data in the same way that their competitors will benefit from theirs.

170.     And MultiPlan Cartel members knew how their competitors were exercising their rights under their agreements because, as described in the next section, they regularly met to discuss their efforts on behalf of the Cartel.

iii.     *Members of the MultiPlan Cartel had numerous opportunities to collude.*

171.     The MultiPlan Cartel enjoys multiple opportunities to collude, including many facilitated by MultiPlan itself.

a.     Client "Advisory Board" meetings.

**Page 49 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

172.     First, since at least 2015, MultiPlan senior executives have hosted Client Advisory Board meetings—lavish, multi-day retreats attended by executives of MultiPlan Cartel members.

173.     In 2019, for example, MultiPlan hosted a retreat at a luxury spa in Laguna Beach, California. Executives from MultiPlan, UnitedHealth, Aetna, Cigna, Humana, several Blue Cross Blue Shield associations, Kaiser, Trustmark, Cox Healthplans, and others attended the event. At meetings held during these retreats, these competitors "[t]ypically . . . talk about things they've implemented" using MultiPlan's Data iSight scheme and "other things they're looking at" (meaning how they plan to further suppress rates), and providing their competitors with "new information" about their moves in the industry, according to testimony given under oath by one of UnitedHealth's executives. Additionally, MultiPlan would make presentations concerning the Cartel members' cost reductions, sharing Cartel members' information with their competitors.

174.     The MultiPlan Cartel uses these Advisory Board meetings not only to facilitate information sharing among co-conspirators, but to recruit new ones. As an internal UnitedHealth document shows, MultiPlan carefully arranged events, seating established co-conspirators next to prospective Cartel members at dinners, so that its co-conspirators could help to market the benefits of joining the conspiracy.

175.     MultiPlan hosts these events at least annually—for example, it held another Advisory Board retreat at the same location in 2021.

b.     Road Shows.

176.     MultiPlan also hosts marketing events, which it calls "road shows." It travels to insurance companies and provides updates on the claims repricing methodologies adopted by MultiPlan's customers and their competitors.

**Page 50 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

177.    At these road shows, MultiPlan executives, including Dale White, current Executive Chairman and former President and CEO of MultiPlan, and Susan Mohler, recently retired Senior Vice President of Marketing and Product Management for MultiPlan, produce detailed descriptions of Data iSight's methodology, review the "savings" achieved for MultiPlan's customers, and recommend ways to further suppress out-of-network reimbursements. During one fall 2021 road show, MultiPlan bragged that it was reducing payments for out-of-network services by 61% to 81%. Upon information and belief, MultiPlan meets with each of its clients each year at such road shows, which allows the Cartel to be regularly updated and renewed.

c.      Trade Association Meetings.

178.    The Insurer Defendants and their co-conspirators are not limited only to MultiPlan-hosted events in their opportunities to collude. Rather, most members of the MultiPlan Cartel are members of the trade organization ad lobbying group America's Health Insurance Plans, or AHIP. This includes defendants Aetna, Centene, Cigna, CVS Health, Elevance, HCSC, Humana, BSCA, BCBSMI, Health Alliance, and others. AHIPs board of directors includes The Cahir and CEP of Kaiser Permanente; The Presidents & CEOs of Elevance, CVS (which owns Aetna), Humana, Blue Shield of California, and Blue Cross Blue Shield of Florida; the CEO and Vice Chair of HCSC; and the CEOs of Cigna and Centene.

179.    AHIP hosts conferences, committee meetings, and board meetings multiple times a year. As AHIP boasts, it "plays an important role in bringing together member companies and facilitating dialogues to advocate on shared interests." One of those shared interests is the MultiPlan Cartel. In 2023, MultiPlan sponsored AHIP's annual conference. And upon information and belief, representatives of MultiPlan attended that conference from June 13 to 15 in Portland, Oregon. The fact that members of the MultiPlan Cartel regularly hold closed-door meetings at

**Page 51 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

AHIP conferences provides further opportunities for the Cartel members to collude, and is further circumstantial evidence of the existence of the conspiracy.

> iv. *Members of the MultiPlan Cartel exchanged competitively sensitive business information in furtherance of their scheme.*

180. A company is unlikely to share large volumes of competitively sensitive information with its competitors in the absence of an agreement ensuring that its competitors would do the same. In a competitive market, a company would closely guard such information so it could better compete with competitors.

181. But here, members of the MultiPlan Cartel did just that, agreeing to exchange, and actually exchanging, data regarding health care providers' claims, reimbursement offers to those providers, and the actual amounts paid on those claims. As a UnitedHealth executive testified, it was not at all unusual for MultiPlan to provide the insurer with feedback about what its competitors were doing, whether at advisory board meetings, road shows, or in one-on-one communications. And internally, UnitedHealth executives acknowledged that MultiPlan provided Cartel members with detailed information about what specific competitors were doing: "Dale [White, then President and CEO of MultiPlan,] did not specifically name competitors but from what he did say we were able to glean who was who."

182. Cartel members exchanged the information in real time by transmitting it automatically to MultiPlan through electronic links between MultiPlan and each insurer participating in the Cartel. The information is specific to commercial insurance claims. And the data—pricing information updated in real time—is not publicly available.

183. MultiPlan has publicly bragged about the extent of information shared by the Cartel, boasting about the petabytes of data it has collected in its databases, representing historical

**Page 52 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

claims data from the insurers; and explained that the value of this data share, as well as the way in which the data is shared. Finally, the shared data is granular and unblinded, meaning MultiPlan knows exactly what its competitors and co-conspirators are paying for medical services.

184.    MultiPlan also shares with its co-conspirators information about their competitors' reimbursement strategies that would otherwise be a closely guarded secret.

185.    First, for example, when onboarding UnitedHealth to the conspiracy, MultiPlan's Chief Resource Officer told UnitedHealth executives what override strategy its competitors were using, explaining that fixing its prices at 350% of Medicare reimbursement rates would "be in line with another competitor" and "leading the pack along with another competitor." With this information, UnitedHealth could know what its competitors were doing: that they were benchmarking their reimbursements to Medicare rates (instead of UCR, a fixed dollar value, or some other methodology), and how aggressive they were being.

186.    As a second example, MultiPlan executives told UnitedHealth executives that, by joining the MultiPlan Cartel, it could expect to save $900 million a year. MultiPlan derived this estimate from the data provided by UnitedHealth's competitors; and from this estimate, and given its familiarity with its competitors' relative market shares, UnitedHealth could reasonably discover otherwise confidential information regarding how much its competitors were paying for out-of-network services.

187.    As a third example, MultiPlan prepares secret white papers that it shares with its co-conspirators—user manuals instructing them on how to implement the scheme. These white papers include references to the claims repricing methodologies adopted by horizontal competitors in the relevant market.

**Page 53 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

188.    And one more example: at road shows, advisory board meetings and (on information and belief) at AHIP meetings, insurers talked openly about how they were using MultiPlan's scheme to suppress competition, even going so far as to give one another advice.

189.    In a competitive market, companies would not ordinarily risk sharing their real-time, competitively sensitive pricing information or their cost-management strategies with their rivals. And they would not pay a competitor—in this case MultiPlan—millions of dollars absent an agreement to restrain competition. The Cartel's information exchange is more consistent with an agreement to restrain trade than with competition on the merits. Therefore, this type of information exchange is further evidence of a Cartel agreement among competitors.

> v.      *MultiPlan acted as the enforcer of the Cartel, ensuring that all members continued to collude, rather than compete.*

190.    MultiPlan has been called the "mafia enforcer for insurers." And it takes that role to heart, enforcing rules designed to protect the MultiPlan Cartel from detection, and preventing any Cartel member from exiting the conspiracy to rationally pursue its own economic self-interest by competing with the Cartel and MultiPlan's business model.

> a.      MultiPlan ensured that the Cartel was cohesive.

191.    The MultiPlan Cartel's success depended on all participants depressing out-of-network reimbursements by equivalent (even if not equal) amounts. Allowing each Cartel member to select their own secret overrides posed the risk that one member—perhaps one worried about the antitrust consequences of its actions—might pick less aggressive overrides than its co-conspirators. If they had, healthcare providers may have raised an alarm about those competitors with lower overrides, risking the exposure of the scheme.

**Page 54 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
*U.S.D.C. (W.D. La.) Case No. _____*
*Original Class Action Complaint*

192.    MultiPlan anticipated and guarded against this possibility by retaining the right to bring its co-conspirators' override into close alignment. According to a MultiPlan executive, MultiPlan reserves the right to set its own additional overrides to ensure the Cartel remains cohesive: the Data iSight program can accommodate both "client" *and* "operational overrides."

193.    As a result of MultiPlan's efforts, members of the Cartel could hide their price-fixing collusion behind claims that their bills—while egregiously low—were "industry standard." Rather than acknowledge the harm the Cartel does to healthcare providers, members, like UnitedHealth, blame medical practices that have been forced by the lack of revenue (caused in no small part by the Cartel's scheme) to consolidate into conglomerates owned by private equity firms. United went to far as to commission a "study" by doctors at Yale University to show that private-equity backed emergency medical practices (collections of emergency room doctors) charged exorbitant fees. Although the insurance giant hid its involvement in the publication, its executives personally redlined a draft of the study before publication to ensure its propaganda message was loud and clear. When challenged about its work with MultiPlan (i.e., its participation in the MultiPlan Cartel, UnitedHealth blames private-equity-backed healthcare providers for overbilling.

194.    (Ironically, MultiPlan's largest investors include private equity firm Hellman & Friedman and the Saudi Arabian government's sovereign wealth fund.)

b.      MultiPlan imposed rules to help the Cartel evade detection.

195.    MultiPlan and its co-conspirators learned the wrong lessons from the demise of Ingenix. They did not learn that they should not fix prices for out-of-network reimbursements, or that they had an obligation to use a fair, accurate, and transparent pricing methodology like the one offered by FAIR Health. Instead, they learned that a scheme to fix prices for out-of-network

**Page 55 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

medical care could be thwarted if patients complained about surprise bills. So to protect the Cartel and to try to avoid a repeat of the Ingenix saga, MultiPlan required all Cartel members to impose and enforce a rule meant to evade detection.

196.    The reimbursement offers from Cartel members to medical professionals that provided out-of-network medical services were, as described above, untenably low. Ordinarily, a provider that receives insufficient payment from an insurer for out-of-network services has the option of collecting the balance of the bill from the patient. These "balance bills" could often be steep, and almost always came as a surprise to a patient.

197.    Consider a hypothetical example of a patient who receives out-of-network care, resulting in a $10,000 medical bill. A typical PPO out-of-network plan advertises that, for out-of-network services, an insurer will pay 80% of the covered charges, leaving the patient responsible for the remaining 20%. The patient would (reasonably) expect to pay $2,000, and expect her insurer to pay the remaining $8,000. But, as shown above, the MultiPlan Cartel suppressed out-of-network reimbursements to between 46% and 66% percent below the usual and customary charges for medical care. Assuming, for this example, that MultiPlan "recommended" a payment that was 56% of the charge, the insurer would pay the healthcare provider only $5,600. The provide could then bill the patient for the remainder of the service the insurer refused to pay for, resulting in the patient receiving a bill for $4,400, instead of the $2,000 she expected.

198.    This is how the Ingenix scheme was uncovered. Patients upset with unexpectedly large bills (like a bill for more than double the $2,000 they expected to pay) complained to the New York Attorney General, who launched an investigation that concluded with Ingenix being shut down and its participants paying fines to fund the creation of a legitimate benchmarking service.

**Page 56 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

199.     MultiPlan required that, as a condition of receiving reimbursement from an insurer participating in the Cartel, a provider must agree *not* to balance bill a patient. If patients did not receive an unexpectedly high bill, MultiPlan reasoned, patients could not complain to consumer advocates, and the Cartel could continue undetected.

> c.     MultiPlan enforced the secrecy of the MultiPlan Cartel's price fixing activities.

200.     In addition to setting up safeguards to protect against discovery of the Cartel's activities, MultiPlan also sought to ensure Cartel members did not disclose details of their agreements and repricing scheme.

201.     MultiPlan has a Service Agreement with insurer Allied National, Inc. which includes provisions regarding Allied's use of MultiPlan's repricing services, and thus its involvement in the Cartel. The agreement is labeled "Confidential Not for Distribution," and includes confidentiality provisions which define any information about MultiPlan's repricing services and methodologies as "Confidential Information." The provisions also forbid Allied from using the information in the agreement for any purpose other than accessing MultiPlan's services.

202.     But Allied filed a third-party complaint in *Butler v. Unified Life Insurance Company*.[4] Its complaint included three paragraphs that disclosed information about MultiPlan's repricing services. In response, MultiPlan sued Allied for disclosing the information, leading Allied to remove its filing from the docket and redact the information.

203.     Upon information and belief, MultiPlan has such confidentiality requirements with all of its insurers that prevented the MultiPlan Cartel from being discovered earlier.

> d.     MultiPlan prevented Cartel members from exiting the conspiracy and competing with the Cartel.

---

[4]     No. 17-cv-50 (D. Mont. Nov. 18, 2021).

**Page 57 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

204. MultiPlan, which sits at the heart of the Cartel, also assumed the role of ensuring that no member of the Cartel chose to act in its own interest rather than the interests of the Cartel, and swiftly shut down efforts by individual Cartel members to compete with other insurers.

205. It thwarted one such threat in 2021, when UnitedHealth announced it had created a subsidiary that it called Naviguard, intended to be "an in-house replacement for MultiPlan." As the largest health insurer in the nation, it could draw upon its own database of claims to accomplish out-of-network service cost-containment without paying MultiPlan's fees. UnitedHealth had launched Naviguard in 2020 as a service that applied to its public insurance plans, such as managed Medicare, expanded in 2021 to serve government employers, and it planned to expand the service to commercially insured plans in 2022. So, the insurer developed a plan for exiting its contracts with MultiPlan—abandoning the Cartel—by 2022.

206. UnitedHealth planned to aggressively price its new Naviguard product. Rather than charging plan sponsors a percent of the spread between the billed charge, as members of the MultiPlan Cartel did, UnitedHealth, through Naviguard, offered a fixed, per-member, per-month fee. This offering would introduce considerable price competition to MultiPlan's Cartel. For example, an executive in Hays County, Texas, noted in public meeting minutes, the county paid $263,000 in "shared savings fees" (amounting to 29% of the amount the MultiPlan Cartel undercut providers on their fees) to UnitedHealth for MultiPlan's services in 2019; under the new Naviguard pricing structure, the county would pay a mere $2.50 per member, per month, or $30,000 a year.

207. For the MultiPlan Cartel, UnitedHealth's exit and the rise of Naviguard would be a disaster. MultiPlan's and UnitedHealth's internal documents showed its executives knew UnitedHealth was critical to the Cartel's success. One internal UnitedHealth document boasted

**Page 58 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

that "No other company is as uniquely positioned as we are to make a real contribution to the transformation underway in healthcare." As the largest insurer in the country, it accounted for approximately a third of MultiPlan's business, and one third of the Cartel's repricing activity. Its exit was so consequential that it resulted in volatility in MultiPlan's stock price as the market speculated on UnitedHealth's impending contract termination, the MultiPlan executives repeatedly faced questions from Wall Street analysts on investor calls in 2021 and 2022. Yet MultiPlan used its financial filings and public statements to reassure its co-conspirators that the Cartel remained intact with claims like "[o]ur relationship with our major customers remains as strong as ever," "[w]e have very limited customer turnover," "[c]ustomer retention remains excellent," and "[o]ur customers, *including all of our largest customers*, continue to rely on us."

208.    In a letter purportedly to its shareholders—which it posted publicly to make it available to all members of the Cartel—MultiPlan accused short sellers of starting a rumor that UnitedHealth planned to end its contract with MultiPlan. Of course, this was more than a rumor, but through this letter MultiPlan sought to reassure its co-conspirators, denying that UnitedHealth created Naviguard to compete with the MultiPlan Cartel, insisting that UnitedHealth was "not planning to terminate its relationship with MultiPlan," and claiming its relationship with UnitedHealth "remains strong[.]"

209.    To protect the MultiPlan Cartel and preserve its objectives, MultiPlan aggressively renegotiated with UnitedHealth. For a time, UnitedHealth had been paying MultiPlan 9.75% of the spread between healthcare providers' bills and the suppressed reimbursement MultiPlan produced. UnitedHealth gradually negotiated that down to 7.25%, and had plans to negotiate it even lower. MultiPlan had made concessions to keep UnitedHealth in the conspiracy, but to

**Page 59 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

prevent UnitedHealth from abandoning the Cartel and competing with it through its Naviguard offering, MultiPlan took drastic steps.

210.    Beginning in 2022, UnitedHealth offered its employer-customers the option to engage MultiPlan's services for a fixed per-member, per-month fee, rather than a "shared savings fee." This agreement meant that MultiPlan would take a considerable hit to the fees it could collect from UnitedHealth: rather than receiving a variable spread price, it could get a consistent, low fee. Additionally, MultiPlan invited John Prince (the President and Chief Operating Officer of Optum, UnitedHealth's health services platform and pharmacy benefits manager) to join MultiPlan's board when he stepped down from Optum in 2023.

211.    With this move, MultiPlan had protected the Cartel. In August, 2022, MultiPlan reassured its co-conspirators through its comments on an earnings call that the conspiracy remained intact, reporting:

> [I]mportantly, we are pleased to announce that we have completed a multi-year contract renewal with one of our larger customers . . . . *Despite the near-term financial impact*, we believe this renewal demonstrates the strength of MultiPlan's value proposition . . . . [T]his customer commitment further underpins our confidence in our base business and *enhances our ability to execute on our long-term growth strategy*.

To MultiPlan's co-conspirators, this news signaled that a UnitedHealth exit from the Cartel no longer threatened the success of their scheme: MultiPlan might make less money from UnitedHealth ("the near-term financial impact"), but the Cartel could continue to drive down reimbursements to healthcare providers for out-of-network services ("our long-term growth strategy").

212.    UnitedHealth's decision to scrap its plan to compete with MultiPlan makes little economic sense, absent a conspiracy. It was in the company's interest to compete with its fellow

**Page 60 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

insurers. It was in its interest to stop paying fees for a repricing service it could in-source. Forming Naviguard and ending its contract with MultiPlan was consistent with United's independent rational economic self-interest in a competitive market. Killing off Naviguard in its infancy was in the interest of the MultiPlan Cartel.

> vi. *The MultiPlan Cartel accomplished collusively a goal that would have been against the independent self-interest of any individual member to attempt unilaterally.*

213.    A rational actor in a competitive market would not act against its own economic self-interest.

214.    Yet members of the MultiPlan Cartel have taken many actions against members' self-interest.

215.    First, the agreements between MultiPlan and insurers are, themselves, against the members' self-interest. If a single insurance provider chose to enter into an agreement with MultiPlan, shift away from the traditional UCR method of calculating out-of-network reimbursements, and drastically underpay for out-of-network claims, healthcare providers would *en masse* refuse to treat patients subscribing to that provider when possible (i.e., except in emergency situations). The healthcare provider would then experience serious diminishment in the value and breadth of their insurance offerings and a loss of subscribers, and, therefore, business. It would also make it less likely healthcare providers would join their network, further reducing the value of the insurer's PPO plan and diminishing its earnings.

216.    The single contracting insurance provider would also likely have to undergo lengthy and expensive repricing negotiations after facing pushback from providers. Because numerous insurers have entered into a conspiracy to reprice claims, it is less effective (and less possible) for healthcare providers to negotiate due to the sheer volume of repriced offers.

**Page 61 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

217. The number of negotiations that occur now with members of the MultiPlan Cartel are limited, because the ubiquity of the under-reimbursements from almost every insurer in the market makes it impossible for a healthcare provider to dispute every underpayment. But if a single insurer engaged in MultiPlan's repricing scheme, healthcare providers could more easily negotiate the offending offers.

218. Members of the Cartel have also refrained from taking actions in their own self-interest. For example, none of the co-conspirators has in-sourced their out-of-network repricing efforts, even though, by doing so, they could increase their profits by retaining the fees they otherwise pay to MultiPlan. The one insurer to have attempted this, UnitedHealth, abandoned its efforts after spending considerable sums developing an in-house competitor to MultiPlan's repricing scheme, and instead reaffirmed its commitment to the Cartel.

219. And members of the Cartel have acknowledged that they could not accomplish their dramatic "savings"—i.e., underpayments to providers—without MultiPlan's involvement. They learned this lesson from the Ingenix saga. As Cigna's Chief Risk Officer—the executive responsible for trying to limit the insurer's legal risk—wrote to colleagues:

> We cannot develop these charges internally (think of when Ingenix was sued for creating out-of-network reimbursements). We need someone (external to Cigna) to develop acceptable [rates].

In other words, the ability to call MultiPlan independent, and to point to MultiPlan as the repricer, rather than an internal subsidiary, was critical to insurers hiding the scheme and avoiding legal risk.

       *vii.*    *This is not the first time that the members of the MultiPlan Cartel have colluded to depress and fix prices for out-of-network medical services.*

**Page 62 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

220. The MultiPlan Cartel does not represent the Insurer Defendants' first attempt to fix prices in the market for out-of-network claims reimbursement. From the late 1990s until the late 2000s, insurers tried to fix prices through Ingenix, UnitedHealth's subsidiary, as described above. But that conspiracy was discovered because patients complained to consumer advocates, like the New York Attorney General. The New York Attorney General launched an investigation into the industry's out-of-network reimbursement practices, discovered the Ingenix scheme, and threatened to prosecute the perpetrators—many of them Defendants in this action—for a horizontal price fixing conspiracy.

221. Defendants learned from the Ingenix debacle. But they learned the wrong lessons. They did *not* learn (or perhaps did not care) that horizontal price-fixing conspiracies are illegal. Instead, they learned that balance billing by providers dissatisfied with their unreasonably low reimbursements threatens the discovery of the conspiracy.

222. This time around, Defendants fixed this threat. As a condition of receiving any payment at all for out-of-network claims processed by MultiPlan, members of the MultiPlan Cartel forbid healthcare providers to balance bill their patients, ensuring that patients remain ignorant of how much their doctors and other caregivers are losing, and how little their insurer reimburses their doctors, relative to the amount they collect in premiums.

        *viii.*    *Most Defendant Insurers rapidly joined the MultiPlan Cartel as soon as they were legally able to do so.*

223. Under the 2009 settlements reached with the New York Attorney General, most Insurer Defendants were obligated to use FAIR Health to determine reimbursement rates for out-of-network care for a period of five years after the FAIR Health database became available for use.

**Page 63 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

224.     The FAIR Health database became operational in approximately January of 2011, and the five-year period in which settling insurers were required to use FAIR Health ended in 2015. The expiration of this obligation "opened the door for Multiplan to become the new 'independent' reimbursement pricing provider for health insurers."

225.     Once the obligation to use FAIR Health lapsed, the Insurer Defendants rapidly pivoted to join the MultiPlan Cartel. For example, by 2016, UnitedHealth was already discussing with Multiplan how to implement Multiplan's repricing services most effectively; and in those talks, Multiplan told UnitedHealth that 7 of its top 10 competitors were already using Data iSight. UnitedHealth began using Data iSight for certain plans and treatments that same year, and announced that it would fully implement Data iSight on July 1, 2017 in order to bring it "back into alignment with its primary competitor group: Blues, Cigna, Aetna on managing out-of-network costs."

226.     This timeline shows that the key participants in the MultiPlan Cartel, recognizing the opportunity to return to an industry-controlled methodology that would allow them to depress reimbursement rates, immediately seized that opportunity by shifting from FAIR Health to Data iSight.

227.     MultiPlan helped facilitate this immediate and concerted shift through its own active recruitment efforts. Since at least 2015, MultiPlan has hosted regular Client Advisory Board meetings attended by executives of competing insurance companies. MultiPlan invited both active and prospective clients to these meetings and intentionally "sat prospective clients together with active clients as a sales strategy," as reflected in an internal MultiPlan document from 2017.

       ix.    *The MultiPlan Cartel functions in highly concentrated markets, making*
              *collusion feasible.*

**Page 64 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

228.    High market concentration in the market for health insurance, and MultiPlan's near perfect monopoly in the market for out-of-network claims processing services is circumstantial evidence of agreements to conspire. Their dominant power has allowed the MultiPlan Cartel to flourish and impose anticompetitive effects on the entire relevant market.

229.    The Insurer Defendants and their co-conspirators collectively hold dominant power in the relevant market. Nearly every commercial insurer that participates in the relevant market has agreed with MultiPlan to curb out-of-network reimbursement payments. The members of the MultiPlan Cartel collectively control at least 90% of the relevant market, with the Insurer Defendants alone accounting for more than 60% of the market.[5]

230.    Concentration of the commercial health insurance market[6] can be measured using the Herfindahl-Hirschmann Index (or HHI), defined as the sum of the squares of the market shares. it is small when there are many small firms and grows larger as the market becomes more concentrated. A market with only one firm in it would have an HHI of 10,000. As a benchmark, current DOJ and FTC guidelines deem a market highly concentrated—such that combinations among firms in that market are likely to cause anticompetitive effects—if the HHI is over 1800.

231.    A recent study published by the American Medical Association examined the market concentration of the health insurance market, breaking the market up according to Metropolitan Statistical Markets, or MSAs. It found that 95% of the health insurance MSAs were highly concentrated. In 48% of the MSAs, a single health insurer controlled more than 50% of the

---

[5]    For example, currently, UnitedHealth controls 14% of the healthcare market, Elevance 12%, Aetna 11%, Cigna 10%, Kaiser 7%, and HCSC 6%.

[6]    Discovery and expert analysis may be needed to measure the concentration in the market for PPO plans—i.e., the specific submarket of the health insurance market in which out-of-network claims are reimbursed. However, not all insurers offer PPOs, meaning that, logically, the concentration in those markets will be even higher than in the market for health insurance generally.

Page 65 of 96
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

market. As Dr. Jesse M. Ehrenfeld, president of the AMA noted, this "[h]igh market concentration tends to lower competition among health insurers."

232.     MultiPlan faces almost no competition in the out-of-network claims adjudication business. Zelis is MultiPlan's main competitor. But in 2022, Zelis processed around 2 million claims for repricing. According to a June 28, 2023, presentation, in 2022, MultiPlan processed 546 million claims that same year. Using claims processed as a measure of market power, this would mean MultiPlan holds 99.6% of the market, while Zelis holds less than 0.4% of the market. Using these figures, the HHI for the market in which MultiPlan peddles its sham algorithm can be estimated as 9,920.

233.     The high market concentration in the health insurance market, along with the way in which health insurance is provided, ensures that healthcare providers cannot seek an alternative to reimbursements by the Cartel. Healthcare providers have no choice when seeking payment for out-of-network services they provided to a patient. Frequently their only option for reimbursement is to submit a claim to the patient's insurance company. If that insurer is a member of the MultiPlan conspiracy—and the vast majority are—the healthcare provider has no choice but to seek reimbursement from a MultiPlan-repriced claim.

> x.     *The MultiPlan Cartel is protected by high barriers to entry into the insurance market.*
>
> > a.     Efforts to launch a new, competing insurance company face high barriers to entry.

234.     Entering the American health insurance commercial reimbursement market is hindered by high barriers to entry. New entrants must be able to bear massive expenditures of time and money, required to develop a robust network of healthcare providers large enough to compete as a commercial healthcare insurer. Even without developing an insurance network, there are

**Page 66 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

enormous capital outlays required to operate as a commercial healthcare payor. Entrants then face the challenge of contending with the economies of scale that large incumbent insurers possess. Obtaining name recognition in an industry occupied by longstanding and well-known major players presents an additional hurdle.

235. There is also an actuarial risk for new health insurance networks. If they cannot balance claims paid and revenue generated through premiums or network access fees (such as ASO fees), their capital reserves can quickly deplete.

236. Even if a new entrant to the market experiences initial success, it may not be able to survive long enough to see a return and develop a base of business to allow it to effectively maintain its insureds. Any such new entrant would need to generate enough business fast enough to effectively spread its risk.

237. Furthermore, a new entrant to the market would be charged with receiving accreditation in every state in which it seeks to operate—functionally all 50 states plus Washington, D.C., must ensure it is in compliance with all applicable federal and state laws, and must assemble what is an expensive team of experts to remain up to speed on all of the latest developments in the various applicable laws and regulations.

238. These barriers to entry further solidify the dominance of the members of the MultiPlan conspiracy alleged herein by ensuring that any entity which tries to enter the market but rejects MultiPlan's price-fixing scheme cannot undermine the conspiracy members' ability to impose repriced reimbursement rates on healthcare providers for out-of-network services.

239. In fact, the repricing services themselves also present a high barrier to entry. To develop a third-party repricing service, a new entrant would need to spend copious amounts of money to develop source code and algorithms that effectively reprice out-of-network claims

**Page 67 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

without infringing MultiPlan's patents, develop contractual relationships with the hundreds of commercial insurance networks, and commit significant resources to consistently improving its repricing algorithms and software. As a result, it is unlikely that any company could effectively disrupt MultiPlan's repricing scheme.

240.    These numerous high barriers to entry effectively prevent new entrants from interrupting MultiPlan's position of control. Therefore, these barriers to entry provide further circumstantial support for the existence of the conspiracy alleged herein.

> b.    MultiPlan has shielded the Cartel from competition by patenting its sham Data iSight algorithm.

241.    At the time that MultiPlan acquired NCN and its Data iSight technology in or around June of 2011, NCN had not yet obtained a patent for Data iSight. It had tried. But, just a few days after the acquisition, the U.S. Patent and Trademark Office (PTO) issued a final rejection of its patent application, explaining that the invention was obvious, and therefore unpatentable under 35 U.S.C. § 103.

242.    In October of 2011, after acquiring NCN, MultiPlan petitioned the PTO to reconsider, filing a request for continued examination. And in April of 2012, nearly four years after NCN initially filed the application, the PTO issued U.S. Patent No. 8,103,522, which claimed, among other things, a database and benchmarking module configured to calculate reimbursement amounts for medical claims by comparing the claim to similar claims.

243.    By securing this patent, MultiPlan erected a high barrier to competition. It already faced almost no competition from other claims repricing companies: it processed 273 times more claims than its closest competitor, Zelis. But by patenting its repricing methodology, it ensured that it could prevent anyone from launching a competing product and luring Cartel members away

**Page 68 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

to restore competition in the market for out-of-network claims reimbursements until the patent expires in October of 2029.

5. <u>MultiPlan makes hundreds of millions of dollars per year from this scheme; the Insurer Defendants make billions; and healthcare providers have lost even more.</u>

244. Through this scheme the MultiPlan Cartel severely depressed reimbursements paid to healthcare providers for out-of-network medical care. But by shorting our country's doctors, MultiPlan and its insurer co-conspirators made billions. As UnitedHealth's former Vice President of Out-of-Network Programs has candidly explained: "with every percentage [insurers] cut, [the insurers] makes more, and the doctors are paid less."

*i.* *The MultiPlan Cartel's scheme resulted in billions of dollars in underpayments to healthcare providers every year.*

245. Through a coordinated, collusive scheme, members of the MultiPlan Cartel have been able to underpay healthcare providers by billions of dollars every year. When MultiPlan talks about the Cartel's success, it uses the word "savings." But, as MultiPlan candidly admits, "savings" should be understood to mean underpayments to healthcare providers. In a 2021 road show, MultiPlan compared the payments a doctor would expect to receive with and without MultiPlan involved in the out-of-network reimbursement process. It provided a modest example: a doctor reimbursed based off of a UCR benchmark would have been paid $800; using the Data iSight "algorithm," the doctor was paid $600, or 25% less.

246. MultiPlan claims it reduces out-of-network billed charges by between 61% and 81%. Properly framed, this means members of the MultiPlan Cartel paid healthcare providers— the same healthcare providers that are right now struggling to survive or have already gone out of business due to the Cartel's activities—a mere 19% to 39% of what they charge to provide often life-saving medical care. But examples provided by MultiPlan's co-conspirators show that it is

**Page 69 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

often even less.

247. For example, UnitedHealth paid one provider just $5,449.27 for a lengthy, complicated surgical procedure to repair tissue and close a wound left after heart surgery, slashing more than $100,000 off the cost of the bill. In another example, UnitedHealth paid just $7,879 of a $152,594 bill—just over 5%.

248. In a competitive market, healthcare providers would have been paid based on a percentage of the historically accepted UCR benchmark as calculated by the independent non-profit, FAIR Health. A study by the New York Comptroller shows what a difference this would have made. In 2020, the Comptroller published a report regarding insurance reimbursements under the state's Empire Plan, the division of the New York State Health Insurance Program that covers state, local government, and school-district employees and their families. The Empire Plan was administered, at the time, by UnitedHealth. The Comptroller studied how those payments changed over time during a time period spanning UnitedHealth's use of FAIR Health's transparent and independent UCR benchmarks (which the Comptroller called "R&C" benchmarks) and its transition to MultiPlan's manipulated reimbursements. The difference was stark, as the Comptroller noted:

> During the five years 2012 to 2016, United paid $1.7 billion for out-of-network services [on behalf of the Empire Plan]. United's payments, based on the R&C rate, totaled approximately $902 million for 4,003,040 services. By comparison, United's payments based on the MultiPlan rate totaled approximately $832 million for 8,861,167.

That is, UnitedHealth paid an average of $225 for services when it calculated reimbursement using FAIR Health's UCR benchmark, compared to $96 when MultiPlan calculated reimbursements. Succinctly: insurers joining the MultiPlan Cartel's collusive reimbursement scheme pay less than

**Page 70 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

half of the usual, customary, and reasonable amount calculated by reference to a fair and independent authority's data.

249.     In absolute numbers, the scope of total underpayment to healthcare providers is staggering:

a.     In 2018, MultiPlan told investors that it identified "savings"—underpayments to healthcare providers—for its 700+ customers that totaled $15.6 billion.

b.     In 2019, MultiPlan reported "savings" of $19.1 billion.

c.     In 2020, it reported "savings" of $18.8 billion.

d.     In 2021, it reported "savings" of $21.7 billion.

e.     In 2022, it reported "savings" of $22.3 billion.

f.     And in 2023, it reported "savings" of $22.9 billion.

ii.     *MultiPlan makes hundreds of millions of dollars per year running the MultiPlan Cartel and underpaying healthcare providers; insurers make billions.*

250.     While healthcare providers have struggled due to these underpayments—with some even declaring bankruptcy because of the reduced reimbursement rates—MultiPlan has profited handsomely. Its revenue generated by the claim repricing tool Data iSight increased from $23 million in 2012 to $323.7 million in 2019. Analytics-based services, like claims repricing tools, accounted for 59% of MultiPlan's revenue as of 2020. In 2021, the importance of analytics-based services to MultiPlan's bottom line grew, accounting for $709 million of MultiPlan's $1.1 billion in total revenue. In 2022, analytics-based services accounted for 66% of MultiPlan's revenue. During this time, MultiPlan consistently had profit margins "in excess of 70%." Today, it accounts for over 90% of MultiPlan's revenue.

251.     And this is just a fraction of the ill-gotten gains its co-conspirators enjoy. For

**Page 71 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

example, UnitedHealth made approximately $1.3 billion off of the scheme in 2020; and it expects to increase that number by $3 billion, bringing annual profits from its role in the MultiPlan Cartel to $4.3 billion, in 2023. Other members of the Cartel have experienced similar gains from the conspiracy—through their coordinated, parallel shift away from reimbursements based on UCR to join the MultiPlan Cartel, insurers increase their margins on full-insured plans, and retain a significant percentage of the savings they capture for their ASO clients.

252.    Much of the Cartel's ill-gotten gains come from fees insurers charged to their ASO clients. Each time the Cartel "repriced" a claim, insurers charged ASO clients a "shared savings fee"—a percentage of the spread, or the difference between the billed charged and the suppressed reimbursement amount. MultiPlan provided the following example in a presentation to investors: If a doctor bills $1,000 for services but accepts the $500 payment advised by MultiPlan, then a $500 difference exists between the billed amount and the amount actually paid. MultiPlan charges the insurance company a fee for forcing this reduced payment on the provider. The fee is usually 5–7% of the difference, so $25–35 in this scenario. The insurance company charges its customer a processing fee, generally between 30–35%, or $150–175 for obtaining these "savings." If Defendants can suppress reimbursements even further, then MultiPlan and the Insurer Defendants reap even greater rewards. If the doctor accepts $200 on the $1,000 bill based on the rate advised by MultiPlan, then MultiPlan and the insurance company take a cut of the $800 difference between the billed amount and the amount paid. The result would be fees for MultiPlan in the range of $40–56 and $240–280 for the insurance company.

253.    The impact of these processing fees is enormous, both in terms of revenues for insurance companies and expenses for their customers. For example, a union health plan for about 1,500 Arizona electricians paid $2.6 million in fees to Cigna in 2019. Cigna charged Arlington

*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
U.S.D.C. (W.D. La.) Case No. _____
Original Class Action Complaint

County, Virginia, $261,000 in such fees one year. And Hays County, Texas, paid $263,000 in one year (considerably more than the $30,000 it would have paid if UnitedHealth had not abandoned its plans to compete with the Cartel through its Naviguard offering).

254.    Often, members of the Cartel collect more in fees than they pay in reimbursements to healthcare providers. For example, data from a lawsuit against Cigna shows that a substance abuse provider charged $1,995.00. After that bill was run through MultiPlan's sham Data iSight algorithm and subjected to Cigna's secret price cap overrides, MultiPlan recommended, and Cigna paid, just $134.13. MultiPlan's fee for this pricing was $167.48—25% more than the providers' pay. And Cigna charged the plan sponsor $658.75—almost five times more than it paid the provider.

255.    Sometimes, the fees are enormous. For example, UnitedHealth charged New Jersey-based trucking company New England Motor Freight $50,650 as a processing fee for just *one* hospital bill. When New England Motor Freight questioned the fee, UnitedHealth executive William T. Raha internally pushed back against the idea of providing a partial refund because of "concern[] about setting precedent" on an issue—that is, providing concessions to clients instead of charging exorbitant processing fees on gross underpayments of out-of-network healthcare reimbursement claims—that "cuts across not only all of Key Accounts, but National Accounts as well," and UnitedHealth's "unwilling[ness] to enter into one-off agreements that cap our revenue." Considering the revenue these fees generate, UnitedHealth has unsurprisingly encouraged ASO clients to cease using FAIR Health (which charges a flat fee) to determine reimbursement rates and instead use MultiPlan's claim repricing tools.

256.    For insurers, participating in the Cartel, underpaying healthcare providers through the Data iSight scheme was far more lucrative than paying a fair reimbursement based on the

**Page 73 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

accurate, transparent, and equitable UCR rates generated by FAIR Health. As a UnitedHealth executive admitted under oath, the MultiPlan Cartel enabled the insurer to raise its margins from $5 per member, per month when it was forced to use FAIR Health as a benchmark, to $30 per member, per month when it joined the MultiPlan Cartel—a 600% increase. UnitedHealth generates about $1 billion in these fees annually: $1 billion generated by exploiting its customers.

> iii. *Unless it is stopped, the MultiPlan Cartel plans to suppress even more payments to healthcare providers.*

257.    Due to the conspiracy's success in artificially suppressing out-of-network reimbursements, Defendants now plan to artificially suppress in-network healthcare claims. In a 2020 presentation to investors, MultiPlan shared its "Vision for MultiPlan 3.0," pursuant to which MultiPlan would "extend into in-network" repricing services. In other words, it would bring its claim repricing tools "to the in-network market" as part of a "cost management" strategy.

258.    Nine out of every ten medical claims are for in-network services. Expanding the Cartel's focus to include these claims would prove very lucrative for the Cartel, as is evident from MultiPlan's predictions about its own additional revenue from the expansion. MultiPlan projected that implementing MultiPlan 3.0, including by "[f]urther deploying artificial intelligence/machine learning" and continuing to "[c]ombine proprietary data with 3rd party data to develop more powerful analytics," would increase revenue by up to $1.15 billion and profits by $720 million. But for healthcare providers, this spells disaster. Given that the fee MultiPlan collects for suppressing out-of-network claims reimbursements is 5% to 7% of the total amount of payments suppressed, this would suggest that the Cartel plans to strip another $16 billion to $23 billion from healthcare providers.

259.    MultiPlan 3.0 involves a three-part "Enhance, Extend, and Expand growth

**Page 74 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

strategy." By extending into "key adjacent markets" and using "AI and machine learning to identify greater savings" MultiPlan will "drive[] more savings for payer customers and support[] their priorities targeting providers and consumers." Put bluntly, MultiPlan intends to continue putting "savings" for their customers ahead of healthcare providers and consumers who it "target[s]," all while claiming to be "on the right side of healthcare."

**C.    The MultiPlan Cartel's scheme to suppress out-of-network reimbursements have directly harmed healthcare providers in Louisiana, including Plaintiff.**

260.    As a local healthcare provider, Plaintiff meets a vital need in southwest Louisiana and parts of southeast Texas. Prior to his retirement this year, Plaintiff, an orthopedic surgeon, worked in the Lake Charles area nearly his whole career. As a surgeon at the only urban center of southwest Louisiana, Plaintiff provided services to the more rural surrounding areas.

261.    As a local healthcare provider, Plaintiff has suffered the losses described above with acuity, and is the perfect example of how MultiPlan's conspiracy negatively impacts healthcare providers. Plaintiff, along with other small local healthcare providers meeting the needs of a large geographic area, cannot sustain the losses created by MultiPlan's reimbursement suppression scheme.

262.    Plaintiff is not unique to this situation. There are hundreds, if not thousands of other small local healthcare practices throughout the state of Louisiana that provide vital healthcare services to both urban and rural populations that are suffering heavy losses due to the MutltiPlan Cartel's scheme.

263.    As described above, there is no option for these healthcare providers but to accept the slashed reimbursement offered by insurers for the services these healthcare providers provide. Because all major, and most minor, insurers are members of the MultiPlan conspiracy, healthcare

**Page 75 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

providers must accept whatever reimbursements they are offered if they wish to remain in business. Refusing to serve a MultiPlan insurer is impossible.

## V.  FRAUDULENT CONCEALMENT, CONTINUING VIOLATION, AND TOLLING THE STATUTE OF LIMITATIONS.

264. Defendants have affirmatively and fraudulently concealed the conspiracy by various means and methods from at least July 1, 2017, through the present. Plaintiff therefore had neither actual nor constructive knowledge of the facts giving rise to its claim for relief. Plaintiff did not discover, nor could it have discovered through the exercise of reasonable diligence, the existence of Defendants' conspiracy until shortly before filing this Complaint.

265. Defendants engaged in a secret and inherently self-concealing conspiracy that did not reveal facts sufficient to put Plaintiff on inquiry notice.

266. Defendants intentionally conducted their anticompetitive scheme outside of public scrutiny:

a. Defendants other than MultiPlan privately submitted their own claims data to MultiPlan, and MultiPlan in turn used its proprietary repricing tools, the details of which remain confidential, to recommend reimbursement rates;

b. Defendants regularly attended invitation-only industry events, including events held and sponsored by MultiPlan, where they discussed behind closed doors how MultiPlan's repricing tools allowed them to reduce costs by suppressing out-of-network reimbursement rates; and

c. Defendants had private communications and meetings to discuss out-of-network claim repricing, MultiPlan's repricing tools, and use of those tools, including by each Defendants' competitors.

**Page 76 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

267.    Although MultiPlan claims to provide an explanation of its pricing methodology to providers, it and the other Defendants intentionally hid from non-Cartel members, including Plaintiff, that they outsourced pricing of out-of-network reimbursement claims to a shared pricing system that used Defendants' real-time, non-public claims data and combined it with their competitors' real-time, non-public claims data to set out-of-network reimbursement rates.

268.    Defendants, as competitors, entered into horizontal agreements to artificially suppress reimbursements to healthcare providers for out-of-network healthcare services. Those agreements contain non-disclosure and confidentiality clauses that prevent dissemination of the contracts' terms. Because Plaintiff is not a party to those agreements, it did not and could not reasonably access the contract terms that would possibly have alerted it to the antitrust claim.

269.    MultiPlan also made false and misleading statements to conceal that it colluded with insurers (i.e., its competitors) to artificially suppress payments to healthcare providers.

270.    MultiPlan and the other Defendants spent years claiming that reimbursements were derived by algorithm, when in fact they were fixed by members of the MultiPlan Cartel.

271.    Through Defendants' knowing and active concealment of their misconduct, Plaintiff did not receive information that should have put it, or any reasonable person or provider standing in their shoes, on sufficient notice of collusion worthy of further investigation.

272.    Plaintiff could not have had inquiry notice of Defendants' collusion before, at best, March 7, 2022, when an article from a heavily pay-walled source first wrote about MultiPlan. Details on MultiPlan's scheme and the extent and effect of the MultiPlan Cartel were first accessible to the public when the New York Times raised concerns about MultiPlan's practices, based on recently unsealed confidential documents in other litigation. An ordinary person acting reasonably diligently would not have had the time, resources, or specialized training to uncover

**Page 77 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

the misconduct that Plaintiff, through counsel highly experienced in antitrust class action litigation, allege herein.

273.    Furthermore, other lawsuits involving MultiPlan did not alert Plaintiff to the antitrust claims alleged herein. For example, one lawsuit involved in-network claims and did not allege antitrust violations.[7] Another did not allege a conspiracy between MultiPlan and health insurance companies or raise an antitrust claim.[8] Two other lawsuits focused only on the relationship between MultiPlan and one health insurance provider, and one of those suits did not raise an antitrust claim.[9] Last, the Verity lawsuit filed in California state court, like the others involving MultiPlan, also did not put Plaintiff on notice of the claims asserted herein.

274.    The antitrust laws apply to reimbursement payments made to healthcare providers. Plaintiff, therefore, reasonably considered the market for reimbursement payments from commercial health networks to be competitive before the recent events alleged herein.

275.    Plaintiff exercised reasonable diligence at all times since July 1, 2017. Plaintiff could not have discovered Defendants' alleged misconduct sooner by exercising reasonable diligence because of Defendants' deceptive and secretive actions to conceal their misconduct.

276.    Since discovering the possibility of anticompetitive misconduct, Plaintiff has diligently examined Defendants' behavior regarding the suppression of reimbursement rates for out-of-network claims, their coordination regarding the same, and the effects of such suppression through publicly available sources, such as Defendants' public statements and media coverage regarding Defendants and the actions underlying this conspiracy. Once this investigation revealed

---

[7]      *See Plastic Surgery Ctr., P.A. v. Cigna Health & Life Ins. Co.*, No. 17-cv-2055 (D.N.J.).
[8]      *See Hott v. MultiPlan, Inc.*, No. 21-cv-2421 (S.D.N.Y.).
[9]      *See LD v. United Behav. Health*, No. 20-cv-2254 (N.D. Cal.) (no antitrust claim); *Pac. Recovery Sols. v. United Behav. Health*, No. 20-cv-2249 (N.D. Cal.).

**Center for Orthopaedics and Spine, LLC, d/b/a**
**The Orthopaedic Center, et al. v. MultiPlan Inc., et al.**
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

a basis for filing this claim, Plaintiff promptly did so.

277. Defendants' fraudulent concealment of their wrongful misconduct has tolled and suspended the running of the statute of limitations concerning the claims and rights of action of Plaintiff arising from the conspiracy, including all parts of the class period earlier in time than the four years immediately preceding the date this action was filed.

278. Defendants' misconduct has also resulted in a continuing violation against Plaintiff.

279. After initially forming the conspiracy, Defendants have committed overt acts that are part of their ongoing violation.

280. Defendants frequently met at Client Advisory Board meetings and other ad hoc meetings between MultiPlan and its customers to discuss how to improve their conspiracy's efficacy in suppressing out-of-network reimbursements to healthcare providers.

281. Defendants renew their MultiPlan contracts to strengthen and continue the conspiracy, and these new agreements represent continuing violations of the antitrust laws. These new agreements include the 2022 contract between MultiPlan and UnitedHealth, which kept the largest commercial health insurer in the conspiracy and ensured the conspiracy's survival.

282. Defendants also forced shared savings agreements onto employee benefit plans to lock in their profits from artificially suppressing out-of-network reimbursement rates.

283. Defendants' overt actions were new acts beyond the initial conspiracy agreement and necessary to continue the conspiracy. These overt acts continue from at least July 1, 2017, through the present. Renewing and strengthening the agreements that underly the conspiracy and locking in its benefits has inflicted new and accumulating injury on Plaintiff.

284. These continuing violations have tolled and suspended the running of the statute of limitations concerning the claims and rights of action of Plaintiff arising from the conspiracy,

**Page 79 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

including all parts of the class period earlier in time than the four years immediately preceding the date this action was filed.

## VI.    ANTITRUST IMPACT AND IMPACT ON INTERSTATE CONDUCT

285.    The conspiracy directly damages Plaintiff's businesses and property and restrains competition in the market for reimbursements for out-of-network healthcare services paid by commercial payors.

286.    Plaintiff has sustained and continues to sustain economic losses, the full amount of which Plaintiff will calculate after discovery and prove at trial, due to Defendants' artificial suppression of the reimbursement rate for out-of-network healthcare services.

287.    But for Defendants' conspiracy to fix the price paid for out-of-network healthcare services, Plaintiff would have received fair and competitive reimbursements for their out-of-network healthcare services.

288.    While the conspiracy continues, Plaintiff will continue to suffer losses.

289.    The antitrust laws aim to prevent injuries such as those alleged here that stem from a conspiracy among buyers to systematically suppress the price paid for a good or service, such as out-of-network healthcare services. Agreements to reduce price competition or fix prices violate the antitrust laws.

290.    The Insurer Defendants accept MultiPlan's claim repricing tools' recommended rate 98 to 99% of the time. Thus, the Insurer Defendants and Co-Conspirators outsource out-of-network claim pricing to MultiPlan, a shared pricing "brain" that relies on the real-time, proprietary claims data of their competitors to set prices—98 to 99% of the time.

291.    Even in those rare instances where the Insurer Defendants and Co-Conspirators do not defer completely to the MultiPlan rate, that artificially suppressed rate still affects prices

**Page 80 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

because it artificially lowers the baseline reimbursement rate from which the Insurer Defendants and Co-Conspirators base their ultimate rates.

292.    Furthermore, use of MultiPlan's claim repricing tools to set collusive, artificially suppressed reimbursement rates subverts the competitive process more generally by depriving the market of "independent centers of decision-making" and replacing them with decision-making on prices by one shared pricing "brain." *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 190 (2010).

293.    By reason of the unlawful activities alleged herein, Defendants substantially affected interstate trade and commerce throughout the United States, and caused antitrust injury to Plaintiff and Class members.

## VII.    MARKET DEFINITION AND MARKET EFFECTS

294.    Assuming a relevant antitrust market needs to be defined, the relevant product market for purposes of Plaintiff's claims is the market for reimbursements paid by commercial insurers to healthcare providers for claims processed as out-of-network medical services in the State of Louisiana. Within this market, there may be submarkets for reimbursements paid by each specific commercial insurer (or other payor) for the out-of-network medical services provided to their insureds. In this market and its submarkets, healthcare providers like Plaintiff function as sellers of out-of-network medical care, while commercial insurers like Defendants (other than MultiPlan) function as buyers of those services.

295.    Healthcare providers have no reasonable substitutes for the reimbursements provided by commercial insurers for out-of-network medical services. Under various federal and state laws, it is illegal for healthcare providers to seek reimbursements from insureds for most out-of-network claims. Defendants, who dominate the market, force healthcare providers to forego any

**Page 81 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

reimbursement from insureds as a condition of receiving any compensation at all, no matter how meager, for out-of-network claims.

296.   Government sources offer reimbursement payments to healthcare providers, but none of these sources—including Medicare, Medicaid, and Tricare—compete with commercial health insurance. These government sources service populations that are not typically served by commercial health insurance. For example, both Medicare and Medicaid have statutory age, income, and disability requirements, and Tricare is only available to current and former members of the United States military.

297.   Assuming a relevant antitrust market needs to be defined, the relevant geographic market for purposes of Plaintiff's claims is the United States.

298.   Medical providers in the State of Louisiana, like Plaintiff, cannot reasonably turn to payors in other countries, where private medical insurance is uncommon or non-existent and nearly all medical care is administered as part of a comprehensive government program, to be reimbursed for out-of-network medical services. The American healthcare industry, including the market for reimbursement of out-of-network services, is universally recognized by industry participants as distinct from healthcare industries in foreign countries and is subject to a variety of unique federal and state laws and regulations that apply only in the United States.

**Page 82 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

## VIII.  CLASS ACTION ALLEGATIONS

299.    Plaintiff brings this action on behalf of itself and, under Federal Rule of Civil

Procedure 23(a), (b)(2), and (b)(3), as a representative of a Class defined as follows:

> All persons or entities within the State of Louisiana who received
> reimbursement for out-of-network medical care from one or more
> of Defendants or Co-Conspirators, or a division, subsidiary,
> predecessor, agent, or affiliate of such entities, from no later than
> July 1, 2017, until the anticompetitive effects of Defendants'
> unlawful misconduct cease.

Excluded from the Class are Defendants and their officers, directors, management, employees,

subsidiaries, or affiliates, and all governmental entities.

300.    Members of the Class are so numerous that joinder is impracticable. Plaintiff

believes that the Class numbers in the thousands of geographically dispersed members.

Furthermore, the Class is readily identifiable from information and records in Defendants'

possession.

301.    Plaintiff's claims are typical of the claims of Class members. Plaintiff and all Class

members were damaged by the same wrongful conduct of the Defendants, *i.e.*, they will show that

the same anticompetitive and unlawful misconduct injured them and caused them to receive

reimbursements for out-of-network claims that were lower than what they would have received

absent Defendants' wrongful and collusive misconduct.

302.    Plaintiff is represented by counsel with experience in the prosecution of class action

antitrust litigation, and with particular experience with class action antitrust litigation involving

the healthcare industry. Plaintiff's counsel possesses the resources needed to vigorously litigate

the case for the Class.

303.    Plaintiff will fairly and adequately protect and represent the interests of Class

**Page 83 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

members. The interests of Plaintiff and Plaintiff's counsel fully align with, and are not antagonistic to, the interests of Class members. Plaintiff will and can carry out the duties incumbent on class representatives to protect the interests of all Class members.

304.    Questions of law and fact common to the members of the Class predominate over questions that may affect only individual class members because Defendants have acted on grounds generally applicable to the entire Class thereby making damages with respect to the Class as a whole appropriate. Such generally applicable conduct is inherent in Defendants' wrongful conduct.

305.    Questions of law and fact common to the Class include:

a.    Whether Defendants formed a purely horizontal agreement, combination, conspiracy, or common understanding in which they artificially suppressed the rate paid on out-of-network healthcare service reimbursement claims throughout the State of Louisiana;

b.    Whether, in the alternative, Defendants formed a hub-and-spoke agreement, combination, conspiracy, or common understanding in which they artificially suppressed the rate paid on out-of-network healthcare service reimbursement claims throughout the State of Louisiana;

c.    Whether Defendants' alleged misconduct constitutes a *per se* violation of Section 1 of the Sherman Antitrust Act;

d.    In the alternative, whether Defendants' alleged misconduct violates Section 1 of the Sherman Antitrust Act pursuant to a quick look or full Rule of Reason analysis;

e.    Whether Defendants' alleged misconduct constitutes violation of the Louisiana Monopolies Act, codified in Louisiana Revised Statutes (La. R.S.) § 51:121 *et*

**Page 84 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

*seq.*

f.     Whether Defendants' alleged misconduct in fact caused Class members throughout the State of Louisiana to receive artificially suppressed reimbursements on out-of-network healthcare service reimbursement claims;

g.     Whether the unlawful scheme alleged herein has substantially affected interstate commerce;

h.     Whether Defendants' anticompetitive conduct caused antitrust impact to Plaintiff and members of the Class;

i.     The proper quantum of damages to the Class;

j.     The scope and extent of injunctive relief needed to remedy the anticompetitive effects of Defendants' alleged misconduct going forward; and

k.     Whether Defendants fraudulently concealed the existence of the alleged conspiracy or committed continuing antitrust violations beyond the initial conspiratorial agreement, thereby tolling the statute of limitations.

306.     In fact, in cases such as this that allege price-fixing among competitors, including those with a potential hub-and-spoke component, the common legal and factual question regarding the conspiracy's alleged existence by itself has been held to predominate over any possible individualized issues, thus warranting certification.

307.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly-situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured

**Page 85 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.

308.    Plaintiff knows of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

### IX.    FIRST CLAIM FOR RELIEF: CONSPIRACY/COMBINATION IN RESTRAINT IN TRADE

#### *Per se* **Violation of Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1)** **(Against All Defendants)**

309.    Plaintiff repeats and incorporates by reference all preceding paragraphs and allegations.

310.    Plaintiff seeks monetary and injunctive relief on behalf of itself and all other Class members under Section 4 of the Clayton Antitrust Act for Defendants' conduct in violation of Section 1 of the Sherman Act.

311.    Beginning no later than July 1, 2017, Defendants formed and engaged in a continuing contract, combination, or conspiracy to unreasonably restrain interstate trade and commerce in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

312.    The contract, combination, or conspiracy alleged herein has consisted of a continuing agreement among Defendants to knowingly and collectively use MultiPlan's repricing tool to set reimbursement rates for out-of-network healthcare services. This conspiracy has caused Plaintiff and members of the Class to receive artificially suppressed reimbursements for out-of-network healthcare services during the Class Period.

313.    The contract, combination, or conspiracy alleged herein has taken the form of a horizontal conspiracy between competitors, the Insurer Defendants, and a potential competitor, MultiPlan, in the commercial health insurance market in the United States.

**Page 86 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

314.     In the alternative, the contract, combination, or conspiracy alleged herein has taken the form of a horizontal conspiracy between competitors in the United States' commercial health insurance market.

315.     In furtherance of this contract, combination, or conspiracy, Defendants have committed various acts, including the acts alleged above as well as:

a.     The Insurer Defendants provided real-time, private, confidential, and detailed internal claims data to MultiPlan for use in MultiPlan's out-of-network claim repricing tools;

b.     MultiPlan sold and operated its out-of-network claim repricing tool that repriced the reimbursement rate for out-of-network healthcare services claims;

c.     Defendants knowingly used the same out-of-network claim repricing tool that incorporated other Defendants' real-time, private, confidential, and detailed internal claims data to calculate reimbursement rates for out-of-network healthcare services claims;

d.     The Insurer Defendants paid reimbursements for out-of-network healthcare services claims at the rates recommended by MultiPlan's repricing tool;

e.     The Insurer Defendants outsourced out-of-network claims handling to MultiPlan knowing that MultiPlan would set the reimbursement rate of out-of-network healthcare claims at the rates recommended by its repricing tool;

f.     Defendants exchanged sensitive, real-time, private, confidential, and detailed internal claims data with each other, including by using the MultiPlan out-of-network claims repricing tool; and

g.     Defendants used many forms and methods of bilateral and multilateral

**Page 87 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

communication across various settings and venues concerning the reimbursement rate for out-of-network healthcare services claims, including their use of MultiPlan's out-of-network claim repricing tool, which had the purpose and effect of maintaining and reinforcing their anticompetitive scheme.

316. Defendants possess market power in the relevant antitrust market, as alleged herein: the relevant product market is reimbursements of out-of-network healthcare services claims by commercial payors, and the relevant geographic market is the State of Louisiana.

317. Defendants' contract, combination, or conspiracy has led to anticompetitive effects in the form of artificially suppressed reimbursement rates for out-of-network healthcare services claims that fall below the traditional and competitive rates for such claims.

318. As a direct and proximate result of Defendants' past and continuing violation of Section 1 of the Sherman Antitrust Act, Plaintiff has been injured in its business and property and will continue to be injured in its business and property by receiving reimbursements for out-of-network healthcare services claims that are lower than what they would have received absent Defendants' conspiracy.

319. Defendants' conspiracy is a *per se* violation of Section 1 of the Sherman Antitrust Act.

## X.    SECOND CLAIM FOR RELIEF: CONSPIRACY/COMBINATION IN RESTRAINT OF TRADE

### Quick Look or Rule-of-Reason Violation of Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1) (Against All Defendants)

320. Plaintiff repeats and incorporates by reference all preceding paragraphs and allegations.

**Page 88 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

321.     The contract, combination, or conspiracy to unreasonably restrain trade and commerce as alleged herein has taken the form of a hub-and-spoke conspiracy in which MultiPlan served as the hub, the agreements between MultiPlan and the Insurer Defendants and Co-Conspirators to use MultiPlan's claim repricing tool served as the spokes, and the agreement between the Insurer Defendants and MultiPlan to use MultiPlan's repricing tool to reprice reimbursement rates for out-of-network healthcare services serves as the rim. This conduct, which began by at least July 1, 2017, violates Section 1 of the Sherman Antitrust Act.

322.     Plaintiff seeks monetary and injunctive relief on behalf of itself and all other Class members under Section 4 of the Clayton Antitrust Act for this violation.

323.     The contract, combination, or conspiracy alleged herein has consisted of a continuing agreement among Defendants to knowingly and collectively use MultiPlan's repricing tool. This conspiracy has caused Plaintiff and Class members to receive artificially suppressed reimbursements on claims for out-of-network healthcare services during the Class Period.

324.     To further this contract, combination, or conspiracy, Defendants committed various acts, including the acts alleged above as well as:

   a.     The Insurer Defendants provided real-time, private, confidential, and detailed internal claims data to MultiPlan for use in MultiPlan's out-of-network claim repricing tools;

   b.     MultiPlan sold and operated its out-of-network claim repricing tool that repriced the reimbursement rate for out-of-network healthcare services claims;

   c.     Defendants knowingly used the same out-of-network claim repricing tool that incorporated other Defendants' real-time, private, confidential, and detailed internal claims data to calculate reimbursement rates for out-of-network healthcare services

**Page 89 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

claims;

     d.     The Insurer Defendants paid reimbursements for out-of-network healthcare services claims at the rates recommended by MultiPlan's repricing tool;

     e.     The Insurer Defendants outsourced out-of-network claims handling to MultiPlan knowing that MultiPlan would set the reimbursement rate of out-of-network healthcare claims at the rates recommended by its repricing tool;

     f.     Defendants exchanged sensitive, real-time, private, confidential, and detailed internal claims data with each other, including by using the MultiPlan out-of-network claims repricing tool; and

     g.     Defendants used many forms and methods of bilateral and multilateral communication across various settings and venues concerning the reimbursement rate for out-of-network healthcare services claims, including their use of MultiPlan's out-of-network claim repricing tool, which had the purpose and effect of maintaining and reinforcing their anticompetitive scheme.

325.    Defendants possess market power in the relevant antitrust market, as alleged herein: the relevant product market is reimbursements of out-of-network healthcare services claims by commercial payors, and the relevant geographic market is the State of Louisiana.

326.    Defendants' contract, combination, or conspiracy has led to anticompetitive effects in the form of artificially suppressed reimbursement rates for out-of-network healthcare services claims that fall below the traditional and competitive rates for such claims.

327.    As a direct and proximate result of Defendants' past and continuing violation of Section 1 of the Sherman Antitrust Act, Plaintiff has been injured in its business and property and will continue to be injured in its business and property by receiving reimbursements for out-of-

**Page 90 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

network healthcare services claims that are lower than what they would have received absent Defendants' conspiracy.

328.    There are no procompetitive justifications for Defendants' conspiracy, and any proffered procompetitive justifications, to the extent any exist, could have been achieved through less restrictive means.

329.    Defendants' conspiracy violates Section 1 of the Sherman Antitrust Act under either a quick-look or rule-of-reason analysis.

## XI.    THIRD CLAIM FOR RELIEF: MONOPOLIZATION

### Violation of Section 2 of the Sherman Antitrust Act (15 U.S.C. § 2)
### (Against MultiPlan)

330.    Plaintiff repeats and incorporates by reference all preceding paragraphs and allegations.

331.    As alleged herein, from at least July 1, 2017 to the present, MultiPlan possessed monopoly power in the market for commercial health insurance repricing. No other competitor has been able to restrain MultiPlan's ability to dominate this market during the relevant time period. MultiPlan had and has the ability to control commercial health insurance repricing and excludes competitors.

332.    MultiPlan willfully and unlawfully maintained its market power in the commercial health insurance repricing market by engaging in an anticompetitive scheme to prevent legitimate competition on the merits. MultiPlan's monopoly has been maintained by its anticompetitive misconduct and not as a result of providing a superior product, business acumen, or historical accident.

333.    MutliPlan's course of anticompetitive misconduct, as alleged herein, required the

**Page 91 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

Insurer Defendants to use MultiPlan's repricing tool exclusively or nearly exclusively. MultiPlan has substantially foreclosed the market from actual and potential competition.

334.     There are no valid procompetitive justifications for MultiPlan's exclusionary conduct in the commercial health insurance repricing market. Even if there were (and there are not), any such ostensible procompetitive benefit could have been obtained through a less restrictive means.

335.     As a result of this scheme, Plaintiff and Class members received artificially suppressed reimbursements for the healthcare services they provided. Plaintiff and Class members have been injured by MultiPlan's antitrust violations. Such injury is of the type that the antitrust laws were designed to prevent and flows from that which makes MultiPlan's misconduct unlawful.

336.     Plaintiff is the proper entity to bring a private case concerning this conduct. The direct purchasers of MultiPlan's repricing services—insurers—are all subject to MultiPlan's control with respect to out-of-network claims repricing, are MultiPlan's co-conspirators, and benefit from the scheme.

337.     MultiPlan's anticompetitive acts violate Section 2 of the Sherman Antitrust Act.

## XII.     FOURTH CLAIM FOR RELIEF: CONSPIRACY TO MONOPOLIZE

### Violation of Section 2 of the Sherman Antitrust Act (15 U.S.C. § 2)
### (Against MultiPlan)

338.     Plaintiff repeats and incorporates by reference all preceding paragraphs and allegations.

339.     As alleged herein, from at least July 1, 2017 to the present, MultiPlan possessed monopoly power in the market for commercial health insurance repricing. No other competitor has

**Page 92 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

been able to restrain MultiPlan's ability to dominate this market during the relevant time period. MultiPlan had and has the ability to control commercial health insurance repricing and excludes competitors.

340.     Defendants conspired to unlawfully maintain MultiPlan's monopoly. In return for their participation in the conspiracy, each and every Defendant received a share of the difference between what amount a healthcare provider submitted and what was ultimately paid.

341.     The goal, purpose, and effect of the MultiPlan-directed conspiracy was to maintain and extend MultiPlan's monopoly over the commercial health insurance repricing market so as to ensure continued monopoly profits and control.

342.     As a direct and proximate result of the conspiracy to monopolize, Plaintiff and Class members received artificially suppressed reimbursements for the healthcare services they provided and were harmed as a result. These injuries are of the type the Sherman Antitrust Act was designed to prevent, and flow from that which makes MultiPlan's misconduct unlawful.

343.     By engaging in the foregoing misconduct, Defendants have intentionally and wrongfully conspired to monopolize in violation of the Sherman Antitrust Act.

344.     But for Defendants' unlawful conspiracy to monopolize, Plaintiff and Class members would have received more fair reimbursements for the healthcare services they provide.

### XIII.   FIFTH CLAIM FOR RELIEF:
### VIOLATION OF LOUISIANA MONOPOLIES ACT

### (La. Rev. Stat. Ann. § 51:121, *et seq.*)
### (Against All Defendants)

345.     Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

346.     Defendants' conduct as described above also violates the Louisiana Monopoly Act

**Page 93 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

and antitrust statutes, including but not limited to La. Rev. Stat. Ann. § 51:121, et seq., as they have engaged in contracts, combinations, and conspiracies in restraint of trade and commerce.

347.    The contract, combination, or conspiracy alleged herein has consisted of a continuing agreement among Defendants to knowingly and collectively use MultiPlan's repricing tool to set reimbursement rates for out-of-network healthcare services. This conspiracy has caused Plaintiff and members of the Class to receive artificially suppressed reimbursements for out-of-network healthcare services during the Class Period.

348.    The contract, combination, or conspiracy alleged herein has taken the form of a horizontal conspiracy between competitors, the Insurer Defendants, and a potential competitor, MultiPlan, in the commercial health insurance market in the State of Louisiana.

349.    Defendants' contract, combination, or conspiracy has led to anticompetitive effects in the form of artificially suppressed reimbursement rates for out-of-network healthcare services claims that fall below the traditional and competitive rates for such claims.

350.    As a direct and proximate result of Defendants' past and continuing violation of La. Rev. Stat. Ann. § 51:121, *et seq.*, Plaintiff and members of the class have been injured in business and property and will continue to be injured in business and property by receiving reimbursements for out-of-network healthcare services claims that are lower than what they would have received absent Defendants' conspiracy.

351.    Plaintiff and members of the class are entitled to recover damages, a reasonable attorneys' fees, and costs as provided under, La. Rev. Stat. Ann. § 51:137.

352.    Plaintiff brings this claim pursuant to La. Rev. Stat. Ann. § 51:129, which permits any private person, including Plaintiff, to institute a suit for relief under this statute.

**Page 94 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

## XIV.   JURY DEMAND

353.    Plaintiff demands a trial by jury on all issues so triable.

## XV.    DEMAND FOR JUDGMENT

WHEREFORE, premises considered, Plaintiff, on behalf of itself and the proposed Class, respectfully prays the Court:

a.     Determine that this action may be maintained as a class action pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3); direct that reasonable notice of this action, as provided by Fed. R. Civ. P. 23(c)(2) be given to the Class; and declare that Plaintiff is the representatives of the Class;

b.     Enter joint and several judgments against Defendants and in favor of Plaintiff and the Class;

c.     Declare the acts alleged herein to be unlawful under the laws set forth above;

d.     Award Plaintiff damages as provided by law in the amount to be determined at trial;

e.     Award the Class damages, and, if applicable, treble, multiple, punitive, and/or other damages, in the amount to be determined at trial, including interest;

f.     Award Plaintiff and the Class the costs of this suit, including reasonable attorneys' fees as provided by law; and

g.     Grant such other and further relief as is necessary to correct for the anticompetitive market effects caused by Defendants' unlawful conduct as the Court deems appropriate.

**Page 95 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**

Dated: October 4, 2024

Respectfully submitted,

/s/  *Todd Townsley*

Todd A. Townsley, LSBA No. 21095
**THE TOWNSLEY LAW FIRM, LLP**
LA State Bar No. 21095
3102 Enterprise Blvd.
Lake Charles, LA 70601
(337) 221-5264
(337) 478-1577 Fax
Service: ahebert@townsleylawfirm.com

Tommy Kherkher, LA. State Bar No.40189
Jarrett L. Ellzey*, Tex. Bar No. 24040864
Leigh S. Montgomery*, Tex. Bar No. 24052214
Alexander G. Kykta*, Tex. Bar No. 24107841
**ELLZEY KHERKHER SANFORD & MONTGOMERY, LLP**
4200 Montrose, Ste. 200
Houston, Texas 77006
Telephone: (713) 322-6387
Facsimile: (888) 276-3455
tkherkher@eksm.com
jellzey@eksm.com
lmontgomery@eksm.com
akykta@eksm.com
Service: firm@eksm.com

D. Brett Turnbull
**TURNBULL, HOLCOMB & MOAK, P.C.**
2501 20th Place South, Suite 425
Birmingham, Alabama 352223
Phone: (205) 831-5040
Fax:    (205) 848-6300
bturnbull@turnbullfirm.com

*Pro Hac Vice Applications Pending

*Counsel for Plaintiff and the Proposed Class*

**PLEASE SERVE**
**MultiPlan, Inc.**
Through its registered agent for service
Corporation Service Company
450 Laurel St., 8th Floor
Baton Rouge, LA 70801

**Page 96 of 96**
*Center for Orthopaedics and Spine, LLC, d/b/a*
*The Orthopaedics Center, et al. v. MultiPlan Inc., et al.*
**U.S.D.C. (W.D. La.) Case No. _____**
**Original Class Action Complaint**